(No. 27897 ▮▮▮▮▮▮▮▮▮ Nos. 27894, 27895, 27896, and
27898.—▮▮▮▮▮▮▮

JOSEPH B. FLEMING *et al.*, Trustees of The Chicago, Rock Island and Pacific Railway Company, Appellants, *vs.* THE ILLINOIS COMMERCE COMMISSION, Appellee.—CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant, *vs.* Same Appellee.—HENRY A. SCANDRETT *et al.*, Trustees of Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Appellants, *vs.* Same Appellee.—CHICAGO AND WESTERN INDIANA RAILROAD COMPANY, Appellant, *vs.* Same Appellee.—A. A. SPRAGUE *et al.*, Receivers of Chicago North Shore and Milwaukee Railroad Company, Appellants, *vs.* Same Appellee.

*Opinion filed September 19, 1944—Rehearing denied in No. 27897 November 16, 1944.*

Martin L. Cassell, Jr., and Harry E. Boe, both of Chicago, for appellants Joseph B. Fleming *et al.;* C. W. Krohl, Eldon Martin, and James A. Gillen, all of Chicago, for appellant Chicago, Burlington & Quincy Rail-

road Co.; CARSON L. TAYLOR, and LARRY H. DUGAN, (A. N. WHITLOCK, and M. L. BLUHM, of counsel,) all of Chicago, for appellants Henry A. Scandrett *et al.;* J. R. BARSE, and SAMUEL KASSEL, both of Chicago, for appellant Chicago and Western Indiana Railroad Co.; RALPH R. BRADLEY, and FREDERICK E. STOUT, both of Chicago, for appellants John B. Gallagher *et al.,* Trustees, successors to receivers.

GEORGE F. BARRETT, Attorney General, (WILLIAM C. WINES, STEPHEN M. FLEMING, and WILLIAM RUFUS MORGAN, all of Chicago, of counsel,) for appellees.

Mr. JUSTICE SMITH delivered the opinion of the court:

In this cause five cases have been consolidated for decision and opinion. The cases consolidated are No. 27894, Fleming *et al.,* Trustees of The Chicago, Rock Island and Pacific Railway Co. v. Illinois Commerce Commission; No. 27895, Chicago, Burlington & Quincy Railroad Co. v. Same; No. 27896, Scandrett *et al.,* Trustees of Chicago, Milwaukee, St. Paul and Pacific Railroad Co. v. Same; No. 27897, Chicago and Western Indiana Railroad Co. v. Same; No. 27898, Sprague *et al.,* Receivers of Chicago North Shore and Milwaukee Railroad Co. v. Same. Each of the cases is an appeal under section 69 of the Public Utilities Act (Ill. Rev. Stat. 1943, chap. 111⅔, par. 73,) from an order of the circuit court of Cook county, affirming an order of the Commerce Commission.

Following the granting by the Interstate Commerce Commission of an increase of 10 per cent in through passenger rates generally, and in one-way and round-trip suburban rates in the Chicago suburban area, each of the appellants filed with the Illinois Commerce Commission tariffs proposing a like increase in commutation or multiple-ride ticket rates in its suburban service in the Chicago area. The rates proposed by the tariffs were to become effective

on March 8, 1942. The commission, however, entered an order in each case suspending the proposed rates and set the case for hearing. Hearings were had. The hearings were concluded in May, 1942, and the cases were taken by the commission for decision. The final order and decision of the commission was filed in the first three cases on November 24, 1942, and in the other two cases on December 9 and December 22, 1942, respectively. By these orders the commission denied the proposed increase in rates and permanently suspended the tariffs filed. Separate appeals from these orders were duly and timely perfected to the circuit court of Cook county. Upon a hearing the circuit court affirmed the order of the commission in each case.

It is here contended by appellants that the orders of the commission should be reversed and set aside for the reason that such orders do not contain sufficient and essential findings of fact; that they are based upon speculation and conjecture and contain erroneous conclusions and recitals; that said orders are unreasonable and unlawful; that the commission disregarded the evidence and considered matters wholly outside the record and which were not in evidence.

Before considering the other questions involved it will be necessary to dispose of appellee's contention that the commission could not approve the proposed rates because of the alleged failure of appellants to comply with the pertinent provisions of the 1942 amendment to the Emergency Price Control Act. (50 U. S. C. A. appendix 961.) That amendment provides: *"Provided,* That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days' notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase."

As already noted, the hearings in these cases were concluded in May, 1942. The cases were then taken by the commission for decision. The above amendment to the Emergency Price Control Act was not passed until October 2, following the submission of the cases. In some of the cases the records show that after the orders of the commission were entered, and while the cases were still pending before the commission, notice was given in accordance with that act. There was no appearance by the Director of Economic Stabilization or the Price Administrator of the Office of Price Administration, either before the commission or in the circuit court. The failure to give such notice did not affect the jurisdiction or powers of the commission, nor in any way change or enlarge the issues. That act only gives to the Director of Economic Stabilization the right to intervene and be heard. It, in nowise, affected the jurisdiction of the commission. *Vinson v. Washington Gas Light Co.* 321 U. S. 489, 64 S. Ct. 731, is decisive on this question. It was there said: "The Emergency Price Control Act of 1942, while it gives the Administrator power over prices of 'commodities,' which are not generally regulated by public authority, specifically and expressly withholds from the Administrator jurisdiction over public utility rates. And, as we have noted, the Stabilization Act of October 2, 1942, did not alter this prohibition but required merely that no utility should generally increase rates in effect September 15, 1942, unless it first gave thirty days' notice to the President or his representative and consented to the timely intervention of that representative before the federal, state, or municipal authority having jurisdiction to consider the increase. It is not clear that this language confers a right of intervention. The bill as passed by the Senate contained a provision that there should be no increase in utility rates unless they were approved by the President. The House refused to concur, with the result that only the language now contained in the proviso ap-

peared in the bill. The assertion that, while the Price Administrator or the Director may present his views to the regulatory body 'he had nothing to say about its decision,' was made and not contradicted on the senate floor in discussion of the conference report. Evidently Congress intended to grant the Administrator plenary control over commodity prices, since they generally were not the subject of local regulation, but in both the original Act and the amendment, as this court has recently said in *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144, 64 S. Ct. 474, 480, was careful 'to avoid paralyzing or extinguishing local institutions.' Thus it limited the right of the Executive to notice by the utility and the utility's consent that the Execuive might be heard by the regulatory body having final authority in the premises. * * * We are asked then, not only to revise the views expressed in *Davies Warehouse Co.* v. *Bowles, supra,* as to the scope of the Acts, but to infer from a general expression of congressional policy, the limitation of existing powers conferred by law on regulatory commissions throughout the nation, both state and federal, and the endowment of a different federal agency with new and superior rights and powers. This we are unable to do."

The failure to give such notice would not, in any event, affect the jurisdiction or powers of the commission or alter its duties in a matter of this kind. The contention of appellee on this branch of the case cannot be sustained.

Four of the cases, *viz.:* Nos. 27894, 27895, 27896 and 27898, involve common questions and may be considered together. A brief reference to the character of the suburban service rendered by appellants in those cases will not be inappropriate. The record in cause No. 27894, Fleming *et al.,* Trustees of The Chicago, Rock Island and Pacific Railroad Co. v. Illinois Commerce Commission (hereinafter referred to as the Rock Island case,) shows that the Rock Island operates suburban service over its main line from Chicago to Joliet, a distance of 40.2 miles. The Chicago

terminus is LaSalle Street Station, which is used jointly with the New York Central. That station and also the tracks and other facilities between that station and Joliet are used by both through and suburban trains. Commutation and other suburban passengers are carried on both. It also operates a suburban line which branches off from the main line at Gresham, Eighty-ninth street, Chicago, and extends westerly and southerly to Blue Island, where it again connects with the main line. The length of the suburban line is 6.7 miles. The tracks and other facilities of this suburban line are used exclusively in the suburban service.

In No. 27895, Chicago, Burlington & Quincy Railroad Co. v. Illinois Commerce Commission (hereinafter referred to as the Burlington case,) the record shows that the railroad company operates suburban service between Chicago and Aurora, and intermediate stations, a distance of 38 miles. The Chicago terminus is the Union Station. The suburban service is operated over its main line. Commutation and other suburban passengers are carried on both suburban and through trains.

In No. 27896, Scandrett et al., Trustees of Chicago, Milwaukee, St. Paul and Pacific Railroad Co. v. Illinois Commerce Commission, (hereinafter referred to as the Milwaukee case,) the record shows that the suburban service is operated over two lines of railroad. One of these lines extends from Union Station in Chicago to Elgin, a distance of 36.6 miles, while the other extends from Union Station to Walworth, Wisconsin, a distance of 73.2 miles. The tracks and other facilities used by it in its suburban service are also used in the transportation of through freight and passengers.

In No. 27898, Sprague et al., Receivers of Chicago North Shore and Milwaukee Railroad Co. v. Illinois Commerce Commission, (hereinafter referred to as the North Shore case,) the railroad operates suburban service between

Chicago and Waukegan and Chicago and Mundelein, and intermediate stations. Most of its suburban service is conducted over what is known as the Shore Line, extending from the Chicago Loop District, north to Waukegan. It also operates suburban trains over what is designated as the Skokie Line. This line branches off the Shore Line at Howard street and runs north to Milwaukee, Wisconsin. At Lake Bluff it connects with a line extending westerly to Mundelein. Through passenger and freight business is also conducted over the Skokie Line.

In each case testimony and exhibits were admitted in evidence showing a substantial deficit in the income from the operation of the suburban service for the year 1941, and prior to that time. In no case would the proposed increase in rates be sufficient to overcome the deficit shown. In other words, had the proposed increase in rates been in force during the year 1941, there would still be a substantial deficit from the operation of the suburban service.

In the Rock Island case and in the Burlington case, exhibits and testimony were offered showing the value of the property and facilities used and useful in the suburban service. These values were based on the original cost of the facilities, except land. The land values used were the appraisals fixed by the Bureau of Valuation of the Interstate Commerce Commission. In the Milwaukee case and the North Shore case no evidence of the value of properties and facilities used and useful in the suburban service was offered. In those cases appellants take the position that inasmuch as the proof before the commission showed that the proposed increase in rates would not be sufficient to wipe out the deficit arising from the operation of the suburban service, the value of the property and the facilities used and useful in that service is immaterial.

In all four of the cases there was testimony and exhibits showing the allocation of direct expense to the suburban service and the apportionment of expenses jointly incurred

in that service and the through passenger and freight and express service. The bases of such allocation and apportionment were given in detail. No evidence was offered except that introduced by appellants. Throughout the briefs of appellee, complaint is made that the apportionment of joint operating expenses was made only as between the suburban service and the through passenger and freight service, and that no division or apportionment was made of the expenses assigned or allocated to the suburban service, as between the commutation and the one-way and round-trip suburban service. It is argued that the portion of both direct and joint operating expenses allocated to the suburban service as a whole should have been further broken down and segregated to the commutation service as distinct from the one-way and round-trip suburban service. The testimony and the exhibits before the commission show that the rates for one-way and round-trip fares were higher than the commutation fares; that the one-way and round-trip fares had been increased 10 per cent by the order *Ex Parte 148* of the Interstate Commerce Commission, entered on January 21, 1942. It is, therefore, obvious that inasmuch as the commutation rates were lower than the one-way and round-trip fares a further refinement of operating expenses and segregation of those expenses between the commutation service and other suburban service would only aggravate and increase the deficit in the commutation service. The commutation passengers and the one-way and round-trip passengers use the same facilities and are given identical service. The cost of carrying the commutation passenger would, therefore, be the same as the cost of carrying the passenger riding on a one-way or round-trip ticket. The evidence shows that the commutation rates produce a lower passenger-mile revenue than the one-way and round-trip fares.

Appellee also complains that in some of the cases there was no proof of the value of the facilities used and useful

in the suburban service and in others that such values as were shown were not segregated between the commutation service and the one-way and round-trip suburban service. Reference has already been made to the showing in each case that the proposed increase in rates would be insufficient to overcome the deficit from the operation of the suburban service. The carriers were not seeking a return on any investment. They were merely seeking an increase in rates in order to reduce the operating deficits. In view of this evidence before the commission, the question of the value of the facilities used and useful in the suburban commutation service was academic. The commission also complains in its orders and in its briefs that there was no proof offered as to the original cost of the facilities used in the suburban service, less depreciation; the cost of reproducing the properties and facilities, less depreciation, or, the prudent investment in such facilities and land, fairly and justly used in rendering the suburban service.

As already related, the proof that was offered on the question of the value of the facilities used and useful in the suburban service was on the original cost basis. If the commission was of the opinion that the value of the property used and useful in the commutation service was material and that some other formula should be used in arriving at such values, it should have indicated the formula it would approve and required evidence to be offered on the basis of such formula. It could then have made a finding on the question of such value which could be reviewed by the courts, as contemplated by the Public Utilities Act. A hearing before the commission is not a partisan hearing with the commission on one side arrayed against the utility on the other. It is an administrative investigation instituted for the purpose of ascertaining and making findings of fact. It was manifestly arbitrary and unfair to raise in its final order, for the first time, the question of the correctness of the formula and the basis on which

the evidence concerning the value of the property for rate-making purposes was offered.

The commission also, in discussing the evidence in its orders relating to the allocation of joint expenses to sub-urban service, repeatedly asserts that such evidence could not be considered, because the commission was of the opinion the portion of such expenses charged to the sub-urban service was too high. In other words, the commis-sion repeatedly asserts in its orders that it disregards the evidence and acts upon its own opinion and conclusions, not based upon any evidence in the case. In this the com-mission was in error.

At the request of the examiner during the hearings, statements of the system income of each of the carriers for a portion of the year 1942, as compared with like periods in 1941, were produced and admitted in evidence over the objection of the carriers. These exhibits showed only the total income from all classes of business, both freight and passenger, including both through and sub-urban, transported over the entire system, for the periods indicated. There was no attempt to show that any part of the increase in revenue shown by these exhibits was applicable to, or derived from, the suburban service or any branch of such service. Based upon this increase in the incomes from the entire systems, the commission, in its orders, speculated that there had probably been a substan-tial increase in revenue from the suburban service during the year 1942, as compared with the year 1941. This was a pure speculation and an assumption by the commission, without any evidence in the record to support it. These exhibits did not show an increase in suburban revenues and afforded no basis for such conclusions.

The commission, in its orders, also recites that an exam-ination of "Moody's Railroads, Weekly Cumulative Index, Volume 14, No. 23, issued Oct. 28, 1942 and No. 24, issued Oct. 31, 1942," showed that the gross operating

revenues of the one hundred twenty-three Class I carriers of the United States for the nine-month period ending September 30, 1942, increased approximately 36.9 per cent over the corresponding period of 1941. From this and from the increase in the system revenues of appellants during a portion of the year 1942, over a like period of 1941, the commission reached the conclusion that during the year 1942, appellants had probably enjoyed a substantial increase in revenues from suburban commutation service and were not entitled to the proposed increase in rates. In this connection it should be noted that the publications referred to were not offered in evidence and were not published until October 28 and 31, 1942, after the hearings were concluded in May, 1942.

In *Atchinson, Topeka and Santa Fe Railway Co.* v. *Commerce Com.* 335 Ill. 624, we said: "The commissioners cannot act on their own information. Their findings must be based on evidence presented in the case, with an opportunity to all parties to know of the evidence to be submitted or considered, to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal, and nothing can be treated as evidence which is not introduced as such."

The dominant note of the approach of the commission to the consideration of the questions involved is epitomized in the following quotation from its order in the Milwaukee case: "It must be remembered that Respondent's operations embrace thousands of miles of railroad and runs through practically all states in the Northwest; that it operates through passenger service from and to and through the suburban zone to the principal cities in western territory; that the railroad was built and operated primarily for the conduct of through freight and passenger business; that suburban service was developed as communities developed in the Chicago area; that the equipment used in the suburban service, for the most part, is equipment that has been

previously used in through service; and that suburban service is more or less a byproduct of railroad operations as a whole and any revenue over out-of-pocket expense received contributes that much to the financial prosperity of the carrier."

This language reflects the attitude of the commission in the consideration of the suburban service. The basis for this theory of the commission is contrary to law. In *Northern Pacific Railway Co.* v. *North Dakota,* 236 U. S. 585, 59 L. ed. 735, it was said: "We have, then, to apply these familiar principles to a case where the state has attempted to fix a rate for the transportation of a commodity under which, taking the results of the business to which the rate is applied, the carrier is compelled to transport the commodity for less than cost, or without substantial compensation in addition to cost. We say this, for we entertain no doubt that, in determining the cost of the transportation of a particular commodity, all the outlays which pertain to it must be considered. We find no basis for distinguishing in this respect between so-called 'out-of-pocket costs,' or 'actual' expenses, and other outlays which are none the less actually made because they are applicable to all traffic, instead of being exclusively incurred in the traffic in question. Illustrations are found in outlays for maintenance of way and structures, general expenses and taxes. It is not a sufficient reason for excluding such, or other, expenses to say that they would still have been incurred had the particular commodity not been transported. That commodity has been transported; the common carrier is under a duty to carry, and the expenses of its business at a particular time are attributable to what it does carry. The state cannot estimate the cost of carrying coal by throwing the expense incident to the maintenance of the roadbed, and the general expenses, upon the carriage of wheat; or the cost of carrying wheat by throwing the burden of the upkeep of the property upon

coal and other commodities. This, of course, does not mean that all commodities are to be treated as carried at the same rate of expense. The outlays that exclusively pertain to a given class of traffic must be assigned to that class, and the other expenses must be fairly apportioned. It may be difficult to make such an apportionment, but when conclusions are based on cost, the entire cost must be taken into account."

In *Norfolk and Western Railway Co.* v. *Conley,* 236 U. S. 605, 59 L. ed. 745, the rule was announced as follows: "The fundamental question presented is whether the validity of the passenger rate can be determined by its effect upon the passenger business of the company, separately considered. What has been said in the opinion in *Northern Pacific Railway Co.* v. *North Dakota,* decided this day (236 U. S. 585, *ante* 735, 35 Sup. Ct. Rep. 429,) makes an extended discussion of this question unnecessary. It was recognized that the state has a broad field for the exercise of its discretion in prescribing reasonable rates for common carriers within its jurisdiction; that it is not necessary that there should be uniform rates or the same percentage of profit on every sort of business; and that there is abundant room for reasonable classification of the adaptation of rates to various groups of services. It was further held that despite this range of permissible action, the state has no arbitrary power over rates; that the devotion of the property of the carrier to public use is qualified by the condition of the carrier's undertaking that its services are to be performed for reasonable reward; and that the state may not select a commodity or class of traffic, and instead of fixing what may be deemed to be reasonable compensation for its carriage, compel the carrier to transport it either at less than cost, or for a compensation that is merely nominal. These considerations are controlling here. The passenger traffic is one of the main departments of the company's business; it has its separate equip-

ment, its separate organization and management, and, of necessity, its own rates. In making a reasonable adjustment of the carrier's charges, the state is under no obligation to secure the same rate of return from each of the two principal departments of business, passenger and freight; but the state may not select either of these departments for arbitrary control. Thus, it would not be contended that the state might require passengers to be carried for nothing, or that it could justify such action by placing upon the shippers of goods the burden of excessive charges in order to supply an adequate return for the carrier's entire service."

In *Banton* v. *Belt Line Railway Corp.* 268 U. S. 413, 45 S. Ct. 534, it was said: "There is involved only the rates applicable to a part of the company's business. In this respect, the case is similar to *Northern Pacific Railway* v. *North Dakota,* 236 U. S. 585, 35 S. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; *Norfolk and Western Railway* v. *West Virginia,* 236 U. S. 605, 35 S. Ct. 437, 59 L. ed. 745; and *Northern Pacific Railway* v. *Department of Public Works of Washington,* 268 U. S. 39, 45 S. Ct. 412, 69 L. ed. 836, decided April 13, 1925. The applicable law is plain. The state is without power to require the traffic covered by the fare enjoined to be carried at a loss or without substantial compensation over its proper cost. And such cost includes not only the expenditures, if any, incurred exclusively for that traffic, but also a just proportion of the expenses incurred for all traffic of which that in question forms a part. The cost of doing such business is not, and properly cannot be, limited to the amount by which total operating expenses would be diminished by the elimination of, or increased by adding, the transfer passengers in question. It would be arbitrary and unjust to charge to that class of business only the amount by which the operating expenses were, or would be, increased by adding that to the other traffic

carried. Outlays are none the less attributable to transfer passengers because also applicable to other traffic. Operating expenses which are incurred on account of all passengers carried, and which are not capable of direct allocation to any class, should be attributed to the transfer passengers in question in like proportion as such expenses are fairly chargeable to other passengers receiving like service. While the carrier has no constitutional right to the same rate or percentage of return on all its business, the state may not select any class of traffic for arbitrary control and regulation."

In *Mt. Carmel Public Utility and Service Co.* v. *Public Utilities Com.* 297 Ill. 303, this court said: "Where a public utility corporation is engaged in furnishing to the public, through various departments of its business, different kinds of service, it cannot be compelled to carry on a branch of its business which furnishes one kind of such service at a loss even though at the same time its whole business may be conducted at a profit. (*Brooks-Scanlon Co.* v. *Railroad Com.* 251 U. S. 396; *Northern Pacific Railroad Co.* v. *North Dakota,* 236 id. 585; *Norfolk and Western Railroad Co.* v. *West Virginia,* 236 id. 605.)" To the same effect is *Northern Illinois Light and Traction Co.* v. *Commerce Com.* 302 Ill. 11.

In *Smyth* v. *Ames,* 169 U. S. 466, 42 L. ed. 819, it was said: "In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier; or to the profits derived from it. The state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control. Nor can the carrier justify unreasonably high rates on domestic business upon

the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the state that the state can prescribe; and when it undertakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business. The argument that a railroad line is an entirety; that its income goes into, and its expenses are provided for out of, a common fund; and that its capitalization is on its entire line, within and without the state,—can have no application where the state is without authority over rates on its entire line, and can only deal with local rates and make such regulations as are necessary to give just compensation on local business."

In our opinion, the law as there stated, is still in full force and effect. The commission proceeded under a misapprehension of the settled rules of law applicable to the questions under consideration. This misconception of the applicable principles of law led the commission to the erroneous conclusions recited in its orders.

The orders cannot be sustained for the further reason that they contain no proper and essential findings. Section 65 of the Public Utilities Act (Ill. Rev. Stat. 1943, chap. 111⅔, par. 69,) provides that the commission shall make and render findings concerning the subject matter and facts inquired into, and enter its order based thereon. In *Chicago Railways Co.* v. *Commerce Com. ex rel. Chicago Motor Coach Co.* 336 Ill. 51, we said: "Section 65 of the Commerce Commission act requires the commission to make and enter findings concerning the subject matter of facts inquired into and enter its order based thereon. Such findings must be specific enough to enable the court

to review intelligently the decision of the commission and ascertain if the facts on which the commission has based its order afford a reasonable basis for it."

In *Louisville and Nashville Railroad Co. v. Commerce Com. ex rel. Village of Belle Rive,* 353 Ill. 375, it was said by this court: "Section 65 of the Public Utilities act (Cahill's Stat. 1931, par. 84,) requires that the commission make and enter findings of fact concerning the subject matter inquired into and enter its order based thereon. This is a mandate that the commission make findings of fact upon the principal issues of the case, and that such findings be sufficiently specific to enable the court to intelligently review the decision of the Commerce Commission and ascertain if the facts upon which the commission has based its order afforded a reasonable basis for such order. If they do, the facts found may be re-examined, in connection with the evidence, to determine if they are substantially supported by the evidence, but this court will not enter upon an independent investigation of the evidence to develop facts not found by the commission to sustain its order. (*Chicago, Rock Island and Pacific Railway Co. v. Commerce Com.* 346 Ill. 412; *Kewanee and Galva Railway Co. v. Commerce Com.* 340 id. 266; *Business Men's Ass'n v. Commerce Com.* 337 id. 149.)" To the same effect are *Chicago, Rock Island and Pacific Railway Co. v. Commerce Com.* 346 Ill. 412; *Kewanee and Galva Railway Co. v. Commerce Com. ex rel. Dohrn Transfer Co.* 340 Ill. 266; *Brotherhood of Locomotive Firemen and Enginemen v. New York Central Railroad Co.* 339 Ill. 201, and *Business Men' Ass'n v. Commerce Com.* 337 Ill. 149.

The orders in the four cases here under consideration do not comply with the mandatory requirements of section 65 of the Public Utilities Act. They do not contain any findings as required by that section. Said orders are void for the further reason that they are not based upon the evidence and are predicated upon matters wholly out-

side the evidence offered before the commission. They are in form merely arguments and conclusions based upon assumptions and speculations and are not supported by the evidence in the records. The orders are arbitrary, unreasonable and unlawful, and cannot be sustained.

This brings us to the consideration of cause No. 27897, Chicago and Western Indiana Railroad Co. v. Illinois Commerce Commission. The record in this case presents a somewhat different picture. The Chicago and Western Indiana Railroad Co. (hereinafter referred to as Western Indiana,) is primarily a terminal company. It furnishes stations and other facilities for the use of six trunk line railroads. It owns and operates Dearborn Street Station in Chicago. It also owns various tracks extending from said station to Dolton, Illinois, a distance of 16.6 miles, together with stations, signals, shops, yards, roundhouses and other facilities used in connection therewith. Its capital stock is owned in equal parts by five other railroads, namely; Chicago & Eastern Illinois, Grand Trunk, Wabash, Monon, and Erie. These companies also lease from the Western Indiana the right to use Dearborn Station and other facilities, including tracks and right of way between said station and Dolton, Illinois. These lessee companies will be hereinafter referred to as proprietary tenants. A sixth company, the Atchison, Topeka & Santa Fe (hereinafter referred to as Santa Fe,) is also a tenant. The Santa Fe uses the Western Indiana rails and terminal facilities, but it owns no interest in that company. Each of the proprietary tenants pays a rental equal to one fifth of the interest requirements on the outstanding bonds of the Western Indiana, in so far as those bond issues cover the property which is used in common by said proprietary tenants. Each of said tenants likewise pays a rental equal to 100 per cent of the bond interest requirements applicable to the portion of the property which it uses exclusively. The Santa Fe has a 999 year lease, under which it uses

the Dearborn Station and the Western Indiana tracks and terminal facilities between Twentieth street and Dearborn Station, which is a part of the Dearborn Station-Dolton line. It pays a stated rental in addition to one sixth of the cost of additions and betterments to the property which it uses in common with the other tenants.

The Western Indiana also owns other properties consisting of extensive yards and other facilities which are leased to the Belt Railway Company of Chicago. These properties, however, are not a part of the Western Indiana tracks and facilities, extending from Dearborn Station to Dolton. The property leased by the Belt Railway Company is used exclusively by that company. It maintains the leased property and pays stated rentals which are in excess of the interest requirements on bonds issued by the Western Indiana, representing money expended on the property leased to the Belt. The Elgin, Joliet & Eastern also leases from the Western Indiana other tracks and facilities which are not a part of the line of railroad extending from Dearborn Station to Dolton, and not a part of the properties leased to the Belt. It pays a fixed rental which is not required for interest payments. The amount of these rentals is not otherwise disclosed by the record.

Various portions of the line extending from Dearborn Station to Dolton are used by the five proprietary tenant lines and the Santa Fe, in common with the Western Indiana. This line is divided into some 50 wheelage zones or sections. The common or joint expenses of maintenance and operation are apportioned to the various wheelage zones, and then in turn such expenses apportioned to each zone are apportioned to the Western Indiana and the tenant lines, using that zone, on a wheelage basis. General expenses and taxes are apportioned on the same basis. The Western Indiana does all the switching for the tenant lines at Dearborn Station. It operates the Dearborn Station and is engaged in a small way in freight-switching service for

other railroads, switching cars to and from various industries located on its own lines. In addition to this service the Western Indiana also operates a limited suburban passenger service between Dearborn Station and Dolton. In this service it uses the tracks and facilities extending from Dearborn Station to Dolton, various sections of which are used by the six tenant lines. It operates three suburban passenger trains in each direction daily, except on Saturday when the service is reduced. There is no service on Sunday. In the suburban service it uses train and engine crews engaged solely and exclusively in that service. It employs separate passenger, combination and baggage cars, devoted solely to that service. It uses two locomotives in the suburban service. The record shows that during the last five years preceding the hearings, its net income in excess of interest. requirements was as follows: 1937, $441,117; 1938, $402,120; 1939, $456,651; 1940, $359,-843; 1941, $363,667. During that period, each year it paid from revenues received from rentals and operations, a 6 per cent dividend on its $5,000,000 of outstanding capital stock. In addition to the payment of this annual dividend, it has accumulated a surplus of some $800,000, which is held in its surplus account. Upon its own figures submitted at the hearings, during the year 1941, and the four preceding years, the operation of its suburban service alone, disregarding all rentals received, resulted in a substantial deficit.

Following the increase in one-way and round-trip suburban rates authorized by the Interstate Commerce Commission, by its order *Ex Parte 148*, the Western Indiana filed tariffs with the Illinois Commerce Commission, by which it proposed to increase its commutation or multiple-ride ticket rates in the suburban service, approximately 10 per cent over existing rates. By the same tariffs it also proposed a substantial reduction in the one-way or single-trip ticket fares in that service. It does not carry through passengers. Its passenger business is limited to the sub-

urban service between Dearborn Station and Dolton. The commission entered an order suspending the proposed rates and set the matter for hearing. Hearings were concluded in May, 1942. By an order entered on December 9, 1942, the commission refused to approve the increase in commutation rates and permanently suspended the proposed tariffs as to the commutation rates. It did, however, approve the proposed reduction in the one-way or single-trip fares. An appeal from that order was perfected by the railroad company to the circuit court of Cook county. Upon a hearing, that court affirmed the order of the commission. To reverse the order of the circuit court, the appeal was perfected to this court.

For the purposes of this case, the property and facilities leased to the Belt and the Elgin, Joliet & Eastern must be entirely disregarded. The line from Dearborn Station to Dolton, which is the line used in the suburban service, must be considered as the property used in that service. When so considered, the record shows a line of railroad extending from Dearborn Station to Dolton, a distance of 16.6 miles. The facilities include the Dearborn Station and all other stations and facilities used in the suburban service. Certain portions or zones of this line and these facilities are used by appellant Western Indiana in common with its six tenants. Under the lease contracts, all maintenance, operating and other joint expenses are divided on a wheelage basis between appellant and the six tenants, according to the zones in which the property is used in common. In the operation of this line and facilities, appellant, under those leases, incurs its proportionate share of such expenses. The portion of these expenses allocated to appellant, plus the expenses which are directly incurred by it in the suburban service, represent the cost to appellant of furnishing the suburban service. As against this expense, it receives certain revenues from that service. It also receives the rentals under the leases from the six tenants for the use of the property used in the suburban

service. On this side of the ledger it has sufficient net income from its suburban operations and from these rentals and the rentals received from the Belt and the Elgin, Joliet & Eastern, to pay all its operating expenses and all interest requirements and to provide and pay a dividend of 6 per cent, leaving a substantial balance in its surplus account, as net profits. This is the showing in the record. The rentals received from the property used in the suburban service, for rate-making purposes, must be regarded as income from that property.

If appellant desires and is willing to limit its own operations to a mere technical compliance with the statute (Ill. Rev. Stat. 1943, chap. 114, par. 77,) in order to enable it to lease its facilities to other railroads, it cannot set aside the rentals received for the payment of its interest requirements and dividends and to accumulate a surplus, until the expenses incurred in the limited operations which it maintains are paid. Such expenses are a first charge against those rentals. Neither can it pass on to the public any deficit in its operations in the form of increased rates as long as it derives a substantial net income from the rental of its facilities used in the suburban service.

The burden was on appellant to show that the proposed rates were not unreasonable. While the amount of the rentals derived from the property used in the suburban service was not separately shown, it is apparent that such rentals are substantial when compared with the $2206.28 in estimated additional annual revenues which appellant sought by the proposed increase in rates. On the whole record, it is clear that when such rentals are properly considered, as they must be, as revenues arising from the property used in the suburban service, no deficit from the operation of that service, under the existing rates, was shown. When the evidence in the record is considered, it is obvious that the finding of the commission that the proposed rates were unreasonable is not without substantial support in the evidence.

The fixing of rates is essentially a matter of legislative control. It is not a judicial function. The right to review the conclusion of the legislature, or of an administrative body acting under authority delegated to it by the legislature, is limited to the determination of whether the legislature or administrative body acted within the scope of its authority, whether the order is without substantial foundation in the evidence, or whether a constitutional right of the utility has been infringed upon. If the order does not contravene any constitutional limitation, is within the authority delegated to the commission, and has substantial basis in the evidence, it cannot be set aside by the courts. The courts are without authority to set aside an order of the commission on the facts unless it is against the manifest weight of the evidence. *Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and Electric Co.* 291 Ill. 209.

Upon the record in this case we cannot say that the order involved is without substantial basis in the evidence or that such order is either unreasonable or unlawful. The circuit court did not err in affirming the order of the commission.

In cause No. 27897, the judgment of the circuit court is affirmed. In causes Nos. 27894, 27895, 27896, and 27898, the judgment in each case is reversed and the cause remanded to the circuit court of Cook county with directions to set aside the order of the commission and to remand the cause to the commission.

The original records made before the commission were incorporated in the records filed in this court. The clerk of this court is directed to return said records to the clerk of the circuit court of Cook county.

> *No. 27897, Judgment affirmed;*
> *Nos. 27894, 27895, 27896, and 27898,*
> *Reversed and remanded, with directions.*