(No. 33350.—

CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Appellee, *vs.* ILLINOIS COMMERCE COMMISSION *et al.*—(ILLINOIS ELECTRIC AND GAS COMPANY, Appellant.)

*Opinion filed January 21, 1955—Rehearing denied March 25, 1955.*

FRANK E. TROBAUGH, of West Frankfort, and FRANK-LIN U. STRANSKY, of Savanna, (FRANKLIN J. STRANSKY, of Chicago, of counsel,) for appellant.

FEIRICH & FEIRICH, of Carbondale, and STEVENS, HERNDON & NAFZIGER, of Springfield, for appellee.

LATHAM CASTLE, Attorney General, of Springfield, (HARRY R. BEGLEY, of counsel,) *amicus curiae.*

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

On May 1, 1928, the Western United Gas & Electric Company, which owned and operated an electric light generating plant and distribution system in Murphysboro, entered into a fifty-year contract to purchase all its electric power from Central Illinois Public Service Company, hereafter referred to as CIPS. CIPS agreed to meet all Western's requirements by delivery of electricity at 2300 volts, and to build and maintain at the point of delivery a transformer capable of reducing power from the 66,000 volts at which it was carried in CIPS's transmission lines. CIPS also agreed to construct and maintain certain transmission lines and other equipment required for bringing its power into Western's system.

At the time when this contract was executed, CIPS's system included three generating plants located at Kincaid, Muddy, and Grand Tower. The contract did not stipulate the source of the power to be supplied, but the charges payable by Western were calculated in terms of the Muddy and Grand Tower stations. The demand charge was $1.50 per kilowatt of the highest monthly maximum demand determined on the basis of the number of kilowatt hours of energy used during the highest peak load of these two sta-

tions. And the energy charge, instead of being based on a specific rate of so many cents per kilowatt hour, was a "cost-plus" charge based on the "weighted average operating cost" of producing energy at these two stations, divided by 90 per cent, the latter figure representing allowance for transmission and transformer losses.

The contract was made subject to the approval of the Illinois Commerce Commission, and on July 31, 1928, the Commission approved it, "subject to the right of the Commission upon reasonable notice, to terminate the same when, in its opinion, public interest or convenience requires such termination." The Commission's order of approval also stated: "The approval of the agreement involved herein shall not be considered as in any way affecting the rates of the utilities should the question of rates of either one of the said parties come before the Commission in the future." In 1945, with the consent of CIPS, the contract was assigned to Illinois Electric and Gas Company, referred to hereafter as IEG, which had purchased Western's entire assets.

By 1951 CIPS had made many changes in its plant. A new station of 100,000 kilowatt capacity had been put into operation at Meredosia, and another of 50,000 at Hutsonville. At Grand Tower, which in 1928 had had a capacity of 50,000 kilowatts, an additional unit capable of generating 60,000 kilowatts was put into operation in March, 1951. All the stations except Muddy were now connected by a 138,000 volt line, while Muddy was connected with the rest of the system by a double circuit 69,000 volt line. Under this integrated system it was the practice to meet demand so far as possible by employing the newer and more efficient units. The station at Muddy, which had not been enlarged, was used only on a standby basis, and power drawn from Grand Tower was supplied principally by the new generating unit, the original units being employed only when necessary.

On February 7, 1951, CIPS filed a petition with the Commerce Commission asking that the contract with IEG be modified. The petition alleged that the expansion of CIPS's plant and the establishment of new connecting lines "necessarily required an allocation of production" among all its stations of the energy required by its various customers, including IEG; that such allocation between different stations must be made frequently; and that it was therefore impossible to calculate the compensation CIPS should receive on the basis of the demand on or operating costs of individual stations. The petition also alleged that the cost of production at Muddy exceeded that of the other three stations, and that this station had therefore been reduced to a standby basis. It was further alleged that when the new 60,000 unit at Grand Tower was put into operation, demand and operating costs there would become entirely different from those prevailing at the time when the contract was executed. Although the petition spoke in terms of the difficulty of calculating charges under the contract formula, it is apparent that its underlying premise was that the charges to IEG should be based on the cost of the power actually supplied to it, and that it was no longer possible, or at any rate practicable, to supply IEG exclusively from Muddy and Grand Tower. The petition did not allege, however, that the charges as calculated under the original contract were unreasonably low.

The proposed modification called for delivery of electricity at 33,000 volts or more at the demand charge of $1.50 per month per kilowatt, and an energy charge of .4¢ per kilowatt hour for the first 250 hours per month, and .3¢ per kilowatt hour for any excess. There was also a fuel clause providing for increases or decreases in the energy charge with variations in the price of coal. No other change in the contract was proposed. These terms were substantially the same as those contained in contracts between CIPS and two other utilities, Illinois Power Com-

pany and Central Illinois Gas & Electric Company. The contract with Illinois Power had already been executed and approved by the Commission. The contract with Central Illinois was executed on July 18, 1951, and received Commission approval in June, 1952.

On May 15, 1951, the Commission dismissed the petition on the ground that its allegations were not sufficient. A petition for rehearing was denied. No appeal was taken from this decision, but shortly thereafter, on July 3, 1951, CIPS filed a proposed rate schedule with the Commission, to become effective in thirty days. The schedule was denominated an "original filing of a rate for Wholesale Electric Service to public utilities subject to the jurisdiction of the Illinois Commerce Commission for resale to the general public in the State of Illinois," and it was further limited in application to "electric energy required in the operation of an isolated electric system having no other source of supply of electric energy" than CIPS. IEG, Illinois Power, and Central Illinois Gas & Electric are the only companies presently qualifying under these limitations.

The proposed schedule, hereafter referred to as Rate 12, stated that the rates set forth therein should "cancel and supersede the rates and charges for electric energy" contained in the contract with IEG as well as those contained in the contract with Illinois Power Co. The schedule also stated: "Except for this modification, said agreements and all their terms and conditions shall remain full force and effect." IEG filed objections to the proposed rate, and on July 24 the Commission suspended it until December 1, 1951, and entered into hearings upon the rate. By an order of November 20, 1951, the effective date of the rate was further suspended until June 1, 1952.

It was established in the course of the hearing that under Rate 12 IEG would be charged an average of .94¢ per kilowatt hour, whereas under the contract rate, according to estimates by IEG, the average charge would be .79¢

per kilowatt hour. It was also conceded by CIPS that under Rate 12, the burden of maintaining the transformer station would fall on IEG, at an estimated annual cost of $12,000, plus transformer losses. A witness for CIPS stated, "The only thing that will be left in the contract would be the contractual obligation of IE & G to take current exclusively from CIPS for the period of the contract term."

No evidence of the cost to CIPS of rendering service under Rate 12 was put into the case. In the course of the hearings, the examiner requested CIPS to furnish such evidence. The president of CIPS replied by letter, stating that it was impracticable to arrive at the cost of rendering service on any particular rate except through a comprehensive study involving the cost of rendering service on all rates, since complicated allocations had to be made of property, and of various undivided operating costs such as property and income taxes. The letter stated, however, that the company had initiated such an overall study, and that its results should be available during the latter part of July.

At the conclusion of the hearings, on May 20, 1952, the Commission entered an order cancelling proposed Rate 12. The Commission found that the revised operation of CIPS had materially reduced the combined average weighted monthly cost of producing energy at Grand Tower and Muddy, that under normal conditions most of the energy to be delivered to IEG would continue to come from Grand Tower, and that the method of computing monthly bills as set forth in the 1928 contract had not been made more difficult or changed in any important respect by the fact that Muddy was not longer in full operation or that a new unit had been added to the Grand Tower Plant.

The order also found that CIPS had "failed and refused" to adduce the evidence of costs requested by the examiner; that the present actual or approximate cost to CIPS of furnishing the type of service provided for in

the proposed Rate 12 was material to the issues herein; that the record did not contain sufficient evidence to enable the Commission to determine the justness or reasonableness of proposed Rate 12 or to determine what would be a just and reasonable rate for such service; and that CIPS had failed to sustain the burden of proving that proposed Rate 12 was just and reasonable and had refused to adduce evidence the Commission deemed relevant and material to the determination of a just and reasonable rate.

On June 12 CIPS filed a petition for rehearing which stated that the comprehensive study of its rates previously referred to had now reached a point permitting CIPS to present evidence of the actual or approximate cost of service under Rate 12 if a rehearing should be granted, and that this evidence would show such cost to be not less than .836¢ per kilowatt hour, exclusive of customers accounting and collecting expenses, administrative and general expenses, and Federal income taxes. On June 25, 1952, the Commission granted the petition.

On the rehearing witnesses for CIPS estimated on the basis of operation in 1951 that the average cost per kilowatt hour of energy as it left the company's transmission lines was .836¢. This figure reflected the cost of producing and purchasing energy, depreciation and taxes on plant, and interest and dividend requirements on securities. It excluded, however, several other items of cost—substation transformer losses, customers accounting and collecting expense, sales promotion expense, administrative expenses, and Federal income taxes, the aggregate of which for 1951 was $8,210,623. No attempt was made by CIPS's witnesses to allocate this excluded sum or to estimate how much it would increase the average cost.

IEG offered evidence that the average cost, excluding the same items which the CIPS estimate excluded, would not be over .738¢. IEG also estimated that if the excluded items were added in, the average cost would be not over .78¢.

The figure of .836¢ which CIPS furnished referred to the average cost on all service rendered by CIPS. No evidence was introduced as to the specific cost of serving IEG under Rate 12, or of serving the entire class of customers to which Rate 12 was applicable. At the hearing and in oral argument before the Commission, CIPS took the position that such a figure could not be computed because of the integrated character of the system. Counsel for CIPS contended that the only figures which could be obtained would be "the overall picture of what all these rates together, whether they will bring produce a reasonable return." On the other hand, counsel for CIPS also maintained that "if you have an isolated rate situation, * * * we can't go into cost and investment and all that sort of thing" and that the only way to arrive at a determination of what would be a reasonable charge was by comparison with rates for similar services contained in the contracts with Illinois Power Company and Central Illinois Gas & Electric Co. CIPS's position in short was that neither the specific cost of service to a particular customer nor the overall rate of return to the company could be used to support a specific individual rate increase, since the former could not be calculated at all, while the latter could not appropriately be analyzed every time a particular rate change was proposed.

On March 18, 1953, the Commission again cancelled Rate 12. It found that CIPS had failed to adduce any evidence to show what parts of the excluded cost of $8,210,623, could reasonably be allocated, on the basis of the company's past experience, to the service to be rendered under Rate 12, or to show what additional cost per kilowatt hour such excluded costs or the allocable portion thereof would add to the average cost figure of .836¢, and that a witness for CIPS had testified that it was impossible to compute with reasonable accuracy the specific cost of furnishing service under Rate 12 either to IEG or to the

entire class of customers under that rate. The Commission also found that the actual or approximate total cost of furnishing service under Rate 12 was material, and that the record did not contain sufficient evidence to enable the Commission to determine the reasonableness of Rate 12, "or in the absence of such evidence, to determine what would be a just and reasonable rate for such service; * * * the respondent CIPS Company has failed to sustain the burden of proving that proposed Rate 12 is just and reasonable and has failed to adduce evidence the Commission deems necessary, relevant and material to the determination of a just and reasonable rate."

Upon denial of its petition for rehearing, CIPS appealed to the circuit court of Jackson County. The circuit court held that upon conclusion of a hearing on proposed rates the Commission must either find that the proposed rates are reasonable, and approve them, or it must find them unreasonable, in which case the Commission must either find that the rates already in effect are reasonable, or else determine other rates which would be reasonable. Since the Commission had not pursued any of these alternatives the circuit court held its order "null and void," and set it aside. IEG thereupon appealed to this court. The Attorney General did not join in the appeal, but by leave of court he has filed a brief *amicus curiae* which urges reversal of the judgment of the circuit court.

CIPS has now abandoned any claim that its incomplete cost figures were sufficient evidence that Rate 12 was reasonable. So far as it makes any objection to the Commission's failure to make such a finding, it relies entirely on the Commission's approval of the contracts with Illinois Power Company and Central Illinois Gas & Electric Company. Rates charged to other customers are of course evidence of reasonableness only when conditions of service are similar. (*Antioch Milling Co.* v. *Public Service Co.* 4 Ill. 2d 200.) Since the Commission made no finding as

to whether this requisite similarity was present, we express no opinion on this point. Even if conditions of service were comparable, however, we do not think the rates charged to Illinois Power and Central Illinois would be persuasive. Those rates were established by individually negotiated contracts, and while the Commission approved those contracts, that approval cannot, as a practical matter, be regarded as the equivalent of an order entered in a contested proceeding. The Commission's action, moreover, implies no more than that certain rates are appropriate as between two consenting parties. It does not follow that those rates would be reasonable as applied to an entire class of actual or potential customers. We think it would be contrary to the purposes of the Public Utilities Act to permit a utility to negotiate contracts with one or two customers and then use those contracts to impose similar rates upon another customer who had been unwilling to deal on those terms.

The appellee's real objection, however, is not that the evidence showed its rate to be reasonable, but that the Commission, regardless of the state of the evidence, must in all hearings on a proposed rate establish some rate, either the one proposed or some other. It is CIPS's position that if the proposed rate is cancelled, then an alternative rate must be determined, and conversely, that if no alternative rate is established, the proposed rate must be permitted to go into effect. It is also maintained that the Commission's action in this respect must be taken within ten months from the time when the proposed rate was intended to become effective.

Our decision turns on the construction of section 36 of the Public Utilities Act, which provides: "Unless the commission otherwise orders, no change shall be made by any public utility in any rate or other charge or classification, or in any rule, regulation, practice or contract relating

to or affecting any rate or other charge, classification or service, or in any privilege or facility, except after thirty days' notice to the Commission and to the public as herein provided. * * * Whenever there shall be filed with the Commission any schedule stating an individual or joint rate or other charge, classification, contract, practice, rule or regulation, the Commission shall have power, and it is hereby given authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders, without answer or other formal pleadings by the interested public utility or utilities, but upon reasonable notice, to enter upon a hearing concerning the propriety of such rate or other charge, classification, contract, practice, rule or regulation, and pending the hearing and the decision thereon, such rate or other charge, classification, contract, practice, rule or regulation shall not go into effect. The period of suspension of such rate or other charge, classification, contract, practice, rule or regulation shall not extend more than one hundred and twenty days beyond the time when such rate or other charge, classification, contract, practice, rule or regulation would otherwise go into effect unless the Commission, in its discretion, extends the period of suspension for a further period not exceeding six months. On such hearing the Commission shall establish the rates or other charges, classifications, contracts, practices, rules or regulations proposed, in whole or in part, or others in lieu thereof, which it shall find to be just and reasonable. All such rates or other charges, classifications, contracts, practices, rules or regulations not so suspended shall, on the expiration of thirty days from the time of filing the same with the Commission, or of such lesser time as the Commission may grant, go into effect and be the established and effective rates or other charges, classifications, contracts, practices, rules and regulations, subject to the power of the Commission, after a hearing

had on its own motion or upon complaint, as herein provided, to alter or modify the same." Ill. Rev. Stat. 1953, chap. 111⅔, par. 36.

The contention that the Commission must conclude its inquiry into the proposed rate within a ten-month period confuses the power of the Commission to suspend with its power to determine the reasonableness of the rate. The ten-month period applies only to the former. If that period has expired before the Commission has concluded its inquiry, then the utility may begin collecting charges under the new rate, so far as pre-existing contractual obligations permit. The running of the period does not terminate the Commission's inquiry, however, and the new rate remains subject to permanent cancellation by the Commission's final order in the proceedings. (*Illinois Bell Telephone Co.* v. *Commerce Com. ex rel. City of Edwardsville,* 304 Ill. 357; *City of Edwardsville* v. *Illinois Bell Telephone Co.* 310 Ill. 618.) In the present case no issue as to the Commission's suspension power is presented. The rate was to become effective on August 3, 1951. The Commission suspended it until June 1, 1952, a period of less than ten months. No further order purporting to suspend the rate was ever made, and none was required, for the Commission's order cancelling the rate was entered on May 20, 1952. The prohibition against charging the proposed rate subsequent to that time did not stem from the Commission's power of suspension but from its final order on the merits.

The contention that the Commission should have established some other rate is also based on a misconstruction of section 36. That section requires the Commission to establish only such rates as the Commission "shall find to be just and reasonable." It does not command the Commission unconditionally to establish a rate without such a finding; nor does it compel the Commission to make such a finding.

It is obvious that the Commission cannot be required to establish some alternative rate without evidence in the record that that rate is reasonable. And we think it equally plain that the Commission is not required to take the initiative in seeking out such evidence. While the act authorizes the Commission to investigate a utility's accounts and to appraise its property, and to assess the expenses against the utility, (Ill. Rev. Stat. 1953, chap. 111⅔, par. 41a,) there is nothing in the act indicating that such a power carries with it a duty to exercise it whenever a utility applies for an increase in rates. To impose such a duty might seriously impair the Commission's functions.

It was held by the circuit court, although CIPS did not endorse the suggestion here, that the Commission may avoid the necessity of setting a new rate simply by approving the rate which is already in existence. We do not regard this as a real alternative. The Commission cannot find that a rate is reasonable without evidence, and it makes no difference that the particular rate happens to be one which is currently in existence. Under some circumstances existing rates are "presumed" to be reasonable, in the sense that a later determination to the contrary does not operate retroactively so as to permit a claim for reparations. (See *Mandel Bros.* v. *Chicago Tunnel Terminal Co.* 2 Ill. 2d 205.) But there is no presumption in the sense that a determination of reasonableness must be reached without evidence.

In support of its position, appellee cites the case of *Illinois Bell Telephone Co.* v. *Commerce Com.* 304 Ill. 357. (See also *Illinois Bell Telephone Co.* v. *Commerce Com. ex rel. Cities of Sterling and Rock Falls,* 306 Ill. 165; *City of Edwardsville* v. *Illinois Bell Telephone Co.* 310 Ill. 618.) In that case the Commission cancelled proposed rates without finding them unreasonable and without establishing any others in their stead. The cancellation order

was based entirely on a finding that because of a marked decline in the price of labor and materials entering into the cost of service, it was impossible at that time to fix rates for the future. We held that the Commission was required to determine whether the rates were reasonable or not, and, in the latter event, to establish other rates as reasonable. According to the views expressed in that case the Commission is not required, and in fact is not permitted to establish an alternative rate unless it has determined that the proposed rate is unreasonable. But whether or not this proposition is correct, we do not read the decision as condemning the action taken by the Commission here.

In reaching its decision the court stated, "There appears to be nothing in the statute excusing the commission from establishing what are reasonable rates because changes in prices and industrial conditions are unusual. Such conditions doubtless presented additional problems to the commission in determining what are just and reasonable rates but do not excuse failure to fix rates." (304 Ill. 357, 359.) The opinion does not make clear what evidence was presented before the Commission, or whether all the evidence which would have been material to the inquiry had been presented. In the light of the language quoted above, however, it appears that the decision means only that when a proponent of a rate change has presented sufficient evidence of his present costs and other material factors, the Commission cannot refuse to pass upon the reasonableness of the proposed change merely because unavoidable uncertainties of economic forecasting make it difficult to project those current figures into the future. We do not read that decision as requiring the Commission to make a determination on the merits in every case, regardless of the state of the evidence.

The appellee maintains, however, that in an integrated utility system serving many customers the specific total cost

of service to either a single customer or a class of customers cannot be computed, since this figure must include a share of the joint costs, and since a precise allocation of the latter is impossible. Thus the Commission, according to appellee, has based its denial of the rate increase on the failure of the appellee to produce evidence which is in fact unobtainable.

The argument is not persuasive. The rate which appellee proposed to put into effect was presumably not selected at random but upon the basis of known data considered relevant by the appellee. So far as joint costs are concerned, it may be admitted that there is more than one way in which they may be apportioned, and that the actual apportionment depends upon what factors are deemed significant. It does not follow, however, that no allocation whatever can be made. The Commission did not in this case reject a proposed formula for apportionment on the ground that it was imprecise or improper; the Commission simply called upon the appellee to furnish some justification for its proposed rate increase. In any event the supposed impossibility of calculating specific total cost would not warrant reversal of the Commission's action. If there were relevant factors other than costs which would justify a rate increase, appellee was free to put them in evidence. Apart from the evidence of allegedly comparative rates, however, the appellee chose to support the rate change on the basis of costs alone.

What has just been said also disposes of the suggestion that the Commission's order represents a ruling that specific cost is the sole determinant in every rate-making proceeding. The relative significance of cost, as against other factors which may be relevant in setting the upper or lower limit for rate changes, was not before the Commission and is not involved on this appeal.

We do not intimate that it would be proper for the Commission to make no more than a general finding that

there was insufficient evidence to determine whether the proposed rate was reasonable, or that the proponent had not met the burden of proof. As in the case of orders which pass on the merits, the Commission's findings must be specific enough to reveal the basis of its decision, and of course those findings must be based on the evidence. (See *Peoples Fruit and Vegetable Shippers Ass'n* v. *Commerce Com. ex rel. Illinois Central Railroad Co.* 351 Ill. 329; cf. *New York Central Railroad Co.* v. *United States,* 99 Fed. Supp. 394, aff'd, 342 U.S. 890.) But when those conditions are met there is no impropriety in the failure to determine if the proposed rate is reasonable. *Chicago & Eastern Illinois Railroad Co.* v. *United States,* 107 F. Supp. 118, aff'd 344 U.S. 917.

Those conditions, we think, were met here. The findings of the Commission indicate clearly what was lacking in the evidence introduced before it, and there can be no question but that this evidence fell short of establishing either the reasonableness or unreasonableness of the rate.

Under the view of the *Bell Telephone case* this conclusion would dispose of the appellee's claim that a substitute rate should have been set. We think, however, that even in those cases where the Commission has properly determined that a proposed rate is unreasonable, it will not necessarily be incumbent upon it to establish an alternative rate. Whether this should be done depends upon whether there is evidence that such a rate is reasonable, and such evidence may be lacking even though it is clear that the proposed rate is improper.

The basic flaw in the appellee's theory is that it would relieve a utility of the burden of proof that its proposed rate is reasonable. Under section 36, it is true, the Commission may in its discretion decline either to suspend a proposed rate or to enter upon an initial inquiry into its reasonableness, and the Commission's decision in this regard need not be based upon a finding that the rate is

reasonable. (*Antioch Milling Co.* v. *Public Service Co.* 4 Ill. 2d 200.) But where the Commission does decide to suspend the rate and hold hearings on it, the burden of proof falls on the proponent of the rate whether the proposal is for a change in an existing rate or for the establishment of a new rate. (*Fleming* v. *Commerce Com.* 388 Ill. 138; *Illinois Central Railroad Co.* v. *Commerce Com.* 359 Ill. 563.) Consequently the Commission is not required under section 36 to affirmatively approve a proposed rate without a finding that it is reasonable, or to make a finding of reasonableness in the absence of evidence. The appellee does not explicitly reject this proposition, but the theory advanced does so implicitly, since it would require the Commission to allow a proposed rate to become effective, upon the expiration of the ten months suspension period, in every case but those in which there was evidence that the proposed rate was unreasonable and that some other rate was reasonable. If this were so, a utility desiring to change its rates would be encouraged to adduce as little evidence as possible before the Commission. We do not think the act contemplates such an anomaly.

The judgment of the circuit court of Jackson County is accordingly reversed, and the order of the Commerce Commission confirmed.

*Judgment reversed; order of commission confirmed.*