610 F.2d 897
 197 U.S.App.D.C. 378
 CITY OF OGLESBY, Village of Ladd, and the Cedar Point Light
and Water Company, Illinois, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Illinois Power Company, Intervenor.
 No. 76-1585.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 20, 1977.
Decided Aug. 21, 1979.
As Amended Jan. 10, 1980.
 
 Charles F. Wheatley, Jr., Washington, D. C., with whom Grace Powers Monaco, Washington, D. C., was on the brief, for petitioners.
 Philip R. Telleen, Atty., Federal Power Commission, Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, and Allan Abbot Tuttle, Sol., Federal Power Commission, Washington, D. C., were on the brief, for respondent.
 William T. Hart, Chicago, Ill., with whom David C. Wheeler, was on the brief, for intervenor.
 Before WRIGHT, Chief Judge, and ROBINSON and MacKINNON, Circuit Judges.
 Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 Illinois Power Company, the intervenor, supplies electric energy to petitioners, the City of Oglesby, the Village of Ladd, and Cedar Point Light and Water Company, pursuant to separate contracts. The present controversy arose when Illinois Power lodged with the Federal Power Commission[1] a new rate schedule purporting to increase the charges for service. Petitioners, resisting its filing, contended that Illinois Power lacked any contractual prerogative to change rates unilaterally, and that the rates designated by the parties' agreements were unalterable unless and until modified by order of the Commission itself.
 
 
 2
 The Commission construed Illinois Power's compacts with Oglesby and Ladd as contemplating rate readjustments in the manner prescribed by Illinois law, and on that basis as unconditionally authorizing rate elevations by Illinois Power. By a more direct route, the Commission interpreted the agreement with Cedar Point as likewise tolerating rate revisions on Illinois Power's initiative. Resultantly, the Commission refused to deny Illinois Power the benefit of the proposed rate hike pending investigation and affirmative endorsement by the Commission.[2]
 
 
 3
 We are unable to agree that the Oglesby and Ladd contracts incorporate Illinois law.[3] We hold that the terms of those agreements bar effectuation of rate increases until they are finally approved by the Commission.[4] We concur, however, in the Commission's view that Illinois Power and Cedar Point fashioned a going-rate contract interposing no obstacle to supplier-inaugurated rate changes.[5] Accordingly, we reverse the Commission's order insofar as it pertains to Oglesby and Ladd, and affirm it in its application to Cedar Point.
 
 I. THE ADMINISTRATIVE BACKGROUND
 
 4
 The City of Oglesby and the Village of Ladd maintain and operate their own electric-power distribution systems. Cedar Point Light and Water Company, a privately-owned utility, furnishes energy to about 150 retail customers. All three purchase their requirements exclusively from Illinois Power, a public electric utility subject to the Federal Power Act.[6]
 
 
 5
 On June 27, 1975, Illinois Power tendered for filing with the Commission a new schedule raising its service rates. In response, petitioners, on July 28, submitted a "motion to reject, protest and petition to intervene" alleging, Inter alia, that their contracts[7] with Illinois Power are of the fixed-rate variety governed by the Mobile-Sierra doctrine,[8] and hence are not subject to modification at Illinois Power's behest but only by order of the Commission predicated upon a determination of public necessity therefor.
 
 
 6
 On October 29, 1975, the Commission accepted Illinois Power's filing, suspended the new rates until January 1, 1976, authorized petitioners' intervention and directed a hearing.[9] On March 8, 1976, after that rate had automatically gone into effect,[10] the Commission denied petitioners' motion to reject the controverted increases.[11] It held that a reference to the Illinois Commerce Commission in the Oglesby and Ladd agreements[12] necessitated resort to Illinois law to glean the parties' intentions.[13] Pursuing that course, the Commission surmised that if the Illinois agency elects to suspend rates pending a hearing, under state law the suspension can endure until a final decision is reached.[14] Thus, on the premise that Illinois Power had contracted with Oglesby and Ladd with calculated reference to these procedures, the Commission concluded that operation of the new rates before completion of its investigation would be inconsistent with the parties' understanding.[15] Illinois Power was thus ordered to refund all revenues collected from Oglesby and Ladd after January 1, 1976, in excess of the contract rates.[16] Contrastingly, the Commission read the Cedar Point agreement as a going-rate contract[17] entitling Illinois Power to change the rates unilaterally. Accordingly, a final decisional order by the Commission was not deemed a prerequisite to implementation of the increase affecting Cedar Point.[18]
 
 
 7
 Both Illinois Power and petitioners sought rehearing of the March 8 order. Illinois Power argued that, contrary to the Commission's belief, Illinois law provides for the immediate operation of a rate increase if no agency decision has been reached at the expiration of the limited statutory suspension period. By this construction, Illinois Power's attempt to secure the rate hike would have been sanctioned by Illinois regulatory procedures resembling those delineated in Section 205 of the Federal Power Act.[19] In their petition, the customer group took issue with any utilization of a more lenient burden of proof than that announced in Sierra[20] in determining whether the circumstances warranted a rate increase. Petitioners further objected to the Commission's treatment of the Cedar Point agreement as a going-rate contract.
 
 
 8
 On May 7, 1976, the Commission issued an order rejecting petitioners' bid for rehearing but granting Illinois Power's application therefor.[21] Reversing its March 8 order, the Commission agreed with Illinois Power that the state regulatory agency could put a rate increase into effect prior to final decision on the merits, and that upon lapse of the statutory suspension period without rendition of such a decision that body would have no choice but to permit the increase to become operative.[22] In consequence, the Commission ruled that it had properly permitted Illinois Power's new rate to commence prior to final decisional order.[23]
 
 
 9
 Petitioners, on May 25, 1976, moved for reconsideration and rehearing of the May 7 order, insisting that the contracting parties never intended that Illinois law should dictate whether rates can be increased unconditionally by Illinois Power or, instead, only by a regulatory agency after resolution on the merits. They maintained that the language of their service agreements made clear that the parties contemplated no rate change unless and until finally ordered by the Commission; and that, even if Illinois law applied, in actual practice the Illinois agency had always promulgated a final rate order within the statutory suspension period. On June 25, 1976, the Commission rebuffed petitioners' contentions, denied their request for rehearing and reaffirmed its ruling of May 7.[24] Petitioners then resorted to this court.[25]
 
 II. THE FOUNDATION PRINCIPLES
 
 10
 The ability of contracting parties to determine for themselves whether and under what conditions rates may be altered subject, of course, to the overriding regulatory power of the Commission to adjust rates in the public interest[26] has been delineated in three decisions of the Supreme Court. In Mobile,[27] dealing with provisions of the Natural Gas Act[28] "substantially identical to the equivalent provisions"[29] of the Federal Power Act,[30] the Court held that that legislation does not itself confer upon a natural gas company authority to increase unilaterally a contractually-fixed rate, and that a newly-filed schedule is a nullity insofar as it deviates from the rate previously selected by the parties. On the same day, the Court expressly extended this ruling to the Federal Power Act in Sierra.[31] Mobile was later distinguished, however, in Mem phis,[32] which involved a going-rate agreement providing for payment for gas delivered by a pipeline "under Seller's Rate Schedule . . ., Or any effective superseding rate schedules, on file with the Federal Power Commission."[33] This language was held to authorize unilateral changes in the pipeline's rates "subject to the procedures and limitations of the Natural Gas Act."[34]
 
 
 11
 So, in resolution of the rate-increase disputes, the Mobile-Sierra-Memphis trilogy assigns the preeminent role to the intent of the contracting parties. Although, as is evident, the parties may stipulate the extent to which and the manner in which contract rates may be revised if at all we have recognized that alternatively they "are free to forge a going-rate agreement by a reference to state-law principles which impart that effect."[35] We now are called upon to determine whether Illinois Power, under its contracts with Oglesby, Ladd and Cedar Point, has the ability unilaterally to initiate rate increases by virtue of either the provisions of those contracts or state law incorporated therein.
 
 III. THE OGLESBY AND LADD CONTRACTS
 A. The Parties' Contentions
 
 12
 Petitioners Oglesby and Ladd assert that their service agreements with Illinois Power envision rate modifications only by the Commission after investigation of any proposed change. The pertinent provision in each of these two contracts states:
 
 
 13
 That Municipality hereby agrees to pay Company monthly for electric service rendered during the preceding month, at the rate and charges due and payable therefor, pursuant to Company's Electric Price Schedule, Ill.C.C. No. 5, Sheet No. 47, Service Classification No. 40, as now on file with or hereafter modified by order of the Illinois Commerce Commission.[36]
 
 
 14
 The parties formulated their current agreements after Commission jurisdiction with respect to wholesale rates had become clear.[37] The contractual language, however, is substantially a carryover from earlier compacts dating from 1940.[38] Thus Oglesby and Ladd reason that by referring to an "order" the parties meant simply to advert to the command of the appropriate regulatory agency, which now is the federal rather than the state body. These petitioners conclude that because "order" must be construed to signify an order after agency evaluation of the merits of a new rate proposal, Illinois Power is without authority to effectuate a change absent an administrative decree approving the alteration.
 
 
 15
 The Commission insists, however, that unilateral rate modifications must have been contemplated by the parties, given that Illinois law specifies but one regulatory procedure one similar to that prescribed by Section 205 of the Federal Power Act, the procedural avenue to new rates by party initiative under federal law. Even though provision for change only by agency order seems naturally to negate any inference that the contracts permit rate hikes by the supplier's action alone, the Commission declined to channel Illinois Power's requests for increases through Section 206 of the Federal Power Act[39] governing promulgation of new rates after a Commission finding that existing rates are unreasonable because no comparable procedure was thought to exist in Illinois regulatory law.
 
 B. The Role of State Law
 
 16
 We have had occasion in three fairly recent cases to consider the bearing of state law on the interpretation of electric-supply contracts subject to Commission regulation. We pause briefly to review these decisions in an effort to place the present controversy in sharp perspective.
 
 
 17
 In Richmond Power,[40] we invoked state law in the course of construing two electric-service contracts, one executed after the Commission's jurisdiction over interstate wholesale rates became established and the other predating that era. The later agreement provided in relevant part that power would be furnished "at the rate and under the provisions of Company's . . . Tariff I.P. as regularly filed with the Public Service Commission of Indiana, said tariff being selected by the Customer (Richmond), as long as said tariff is in effect . . . ."[41] Tariff I.P., on file with the Indiana agency, specified a rate formula governing electric-service charges levied against wholesale and retail customers alike.[42] In holding that the contractual language was designed to tie wholesale rates, and changes thereof, to retail-rate patterns which were solely within the province of the state agency[43] we relied upon Richmond's "most plausible explanation"[44] that were wholesale and retail rates allowed to converge, Richmond would be caught in an anticompetitive price squeeze.[45] Because both Richmond and its supplier sold to retail customers, Richmond needed assurance that the supplier would not offer so low a price to retail purchasers that Richmond could not compete for their trade[46] given the price charged Richmond for power furnished by the same supplier.
 
 
 18
 The earlier contract similarly incorporated Tariff I.P.[47] We concluded that under it, too, tariff adjustments permitted by the state agency bore directly on the legality of the supplier's wholesale rate-increase filings with the Commission because of the parallelism between wholesale and retail rates contractually guaranteed.[48] We acknowledged that the parties envisioned rate changes " 'by the order or with the approval of' the appropriate regulatory commission" but regarded that as "beside the point."[49] We noted that the parties originally anticipated that state law would govern the contract, and that under Indiana law rates could not be escalated except through a procedure similar in relevant detail to that erected by Section 206(a) of the Federal Power Act, which necessitates a finding that the existing rate is unreasonable.[50] Hence, in construing the contract "to reflect as nearly as one can the intentions of the parties,"[51] we were constrained to hold that it did not tolerate a unilateral rate change by a filing with the Commission under Section 205.[52]
 
 
 19
 Thus, in interpreting these agreements, we first addressed the threshold question whether state law was relevant at all,[53] and in each instance we discovered factors indicating acceptably the role the parties wished it to play. Contractual references to a tariff of general applicability the retail components of which could be adjusted only by resort to state procedures in combination with a desire to key wholesale rates to retail rates, served to show that the parties intended to implicate the state regulatory process in the operation of their contracts. Having made that determination, we then resolved the ultimate question whether the agreements permitted the suppliers unilaterally to adopt new rates pursuant to Section 205.
 
 
 20
 The principles articulated in Richmond Power were elaborated and applied in Appalachian Power,[54] which involved contracts containing no direct or indirect facial reference to state law. The supplier-party to the first set of agreements objected to the Commission's ruling that they established rates inflexibly within the ambit of the Mobile-Sierra doctrine on the ground that the Commission had refused to consider Virginia law, which was said to prohibit fixed-rate compacts.[55] In rejecting that argument, we adhered to the well-settled canon that "(i)n the absence of ambiguity the intent of the parties to a contract must be ascertained from the language thereof without resort to parol evidence or extrinsic circumstances."[56] Unlike the contracts in Richmond Power, which "expressly adopted the rates set in a tariff on file with a state regulatory agency,"[57] the agreements first under consideration in Appalachian Power themselves evinced no intent whatever that state law should be brought into "the process of ascertaining whether unilateral rate raises were envisioned."[58] Having thus ascertained at the outset that state-law principles were irrelevant to the operation of the contracts, we proceeded to resolve the ultimate question whether the agreements entailed fixed rates by close attention to the contractual language alone.[59]
 
 
 21
 The supplier-party to the second group of agreements in Appalachian Power contended similarly that the Commission erred in declining to look to Kentucky law in construing them, especially because they had their genesis in earlier contracts executed prior to the Commission's assertion of jurisdiction over the supplier's wholesale transactions.[60] The agreements themselves, however, contained "no indication of intent that the Kentucky law should apply,"[61] and consequently we sustained the Commission's conclusion that Richmond Power did not authorize cognizance of any feature of Kentucky regulatory lore.[62] Once again we proceeded to an interpretation of the agreements under scrutiny as fixed-rate in nature, exclusively on the basis of the contractual language.[63]
 
 
 22
 Our decision in Indiana & Michigan[64] lies factually between Richmond Power and Appalachian Power. The intervenor, Indiana Statewide, had originally sought review in this court of the Commission's action in permitting a supplier to file increased wholesale rates.[65] After we decided Richmond Power, the Commission asked us to remand Indiana Statewide's cause to enable it to apply the principles announced therein. The Commission subsequently held that the supplier could not consistently with its contract increase its rates to Indiana Statewide absent a prior Commission order entered under Section 206.[66] On the supplier's petition for review, we affirmed the Commission's position on the merits, observing that its "opinion reflects a reasonable course in applying our Richmond opinion to the contracts of the cooperatives."[67]
 
 
 23
 The significant portions of those agreements, all of which were formulated before any exercise of Commission jurisdiction over the supplier's wholesale rates, provided:
 
 
 24
 Customer agrees to take and pay for the electric capacity and energy delivered to Customer by Company hereunder in accordance with the provisions of Company's Tariff REMC as filed with the Public Service Commission of Indiana, a copy of which tariff is attached hereto as Exhibit A and is hereby made a part of this agreement.
 
 
 25
 Firm Agreement As To Rates and Charges: Should any change in the rates provided for in ARTICLE 3 hereof be ordered by the Public Service Commission of Indiana, payment for services by Customer to Company as provided for in ARTICLE 3 hereof shall thereafter be made upon the basis of such new rates as changed and approved by the Public Service Commission of Indiana . . . .[68]
 
 
 26
 Expressly declining to consider matters of state law,[69] the Commission held that "(r)eference to the contract provisions . . . reveals clearly that a change in rate was to be made only when ordered by the appropriate regulatory agency. . . . (A)n order by this Commission accepting for filing a rate increase filed pursuant to Section 205 is not approval of such an increase by this Commission."[70]
 
 
 27
 Unlike the situation in Richmond Power, no peculiar circumstances emerged in Indiana & Michigan to support the conclusion that the contracting parties intended to draw state regulatory law or practice into their agreements. In Richmond Power, the parties' desire for parity between the wholesale rates overseen by the Commission and the retail rates within the jurisdiction of the state agency a concern manifested in a contractual reference to the general wholesale-retail-rate tariff on file with the state agency led us to interpret that reference as a deliberate effort to define their contract rights by procedural courses available under state law.[71] Because the tariff incorporated by the service compacts in Indiana & Michigan applied only to rural electric-cooperative customers such as Indiana Statewide's membership, plainly the parties could not have contemplated a preservation of parity between wholesale-service charges and some other rate subject to state regulation.[72] Nor did the parties advance any circumstance tending to show that the contractual allusion to the tariff residing with the state agency was a purposeful adoption of the body of state regulatory principles and practices as the determinant of flexibility or rigidity of the agreed-upon rates. Although reference to state law might have raised some question of its designed incorporation by the parties, the language did not clearly enough denote that purpose, and lacking any persuasive indication of such an incorporation state law was disregarded. The Mobile-Sierra status of the agreements thus was ascertained from their terms just as though no mention of state law had been made at all.
 
 
 28
 Upon analysis of our past decisions, then, our accustomed approach to determinations on pertinence of state law to the ability of a party unilaterally to change contractually-specified rates becomes evident. The guiding principle to be kept firmly in mind is that "state law is relevant only to the extent intended by the parties(;) neither state law nor conflict-of-law principles summoning state law operate of their own force upon contracts subject to the Commission's regulatory jurisdiction."[73] When a rate agreement makes no mention of state substantive or procedural rules, or of a state agency or a tariff on file therewith in other words, is devoid of any reference to state law a claim that incorporation of state regulatory law or practice was intended by the parties simply cannot be entertained.[74] Even when some oblique reference to state law appears in the contract, we cannot lightly assume that the parties intended thereby to assimilate that law into the agreement.[75] Only contractual language unmistakably implicating state law in the operation of the contract, or surrounding circumstances illuminating contractual ambiguity on that score by demonstrating that the parties have adopted state regulatory features,[76] warrants consideration of state-law principles, and then only in the course of construing contractual terms otherwise indecipherable without such extrinsic aids. In all cases, the relevance of state regulatory law is to be determined as a threshold matter; only after that is done can one address the central question whether the supplier has retained the right under the agreement to initiate rate increases, and if so upon what conditions.
 
 C. State Law and the Present Contracts
 
 29
 The Commission's construction of the Oglesby and Ladd contracts, even accorded all the deference due,[77] cannot withstand scrutiny under the governing principles. While the issue before us is not whether Illinois Power is totally foreclosed from collecting at some time the rate increase it unilaterally initiated,[78] it Is whether that increase is at all operative while its propriety remains administratively unresolved. Put another way, the question is whether the Mobile-Sierra doctrine affects, not ultimate realization, but temporary effectuation of the new rates for which Illinois Power strives. The Commission felt that the reference in each contract to rate-modification by the Illinois regulatory agency was enough to make state law a factor in the inquiry on whether the higher rates might be put into effect pending the final Commission determination on their validity. That view we hold is erroneous.
 
 
 30
 As the review of our decisions has shown, more is required to establish a purposeful contractual adoption of state law than some unadorned mention of the state regulatory system.[79] And nothing else in the present case evinces even remotely any intention to incorporate the disputed aspects of Illinois regulatory procedure into the agreements. Independently of the procedural characteristics of Illinois ratemaking, Illinois Power was at liberty to covenant to await administrative assessment of the merits of any proposed increase before undertaking to implement it. Thus, even assuming that, as Illinois Power insists, under state law the Illinois agency is incapable of stopping rate proposals from taking effect after expiration of the state's statutorily-prescribed suspension period, nothing prevented the parties from voluntarily entering into an agreement embodying the supplier's stipulation to postpone effectuation of new rates while they remain the subject of an ongoing administrative investigation.[80] A contractual provision conditioning the operation of rate changes upon issuance of an approving order by the Illinois agency therefore does not invoke the ramifications of state regulatory procedure that might come otherwise to the fore.
 
 
 31
 Whether, then, Oglesby and Ladd intended to afford Illinois Power latitude to institute increased rates on its own even temporarily must in these circumstances be ascertained from the terms of their contracts, unshadowed by Illinois law.[81] If what they contemplated on that score, discerned by inspection of the contracts, mirrors the result normally eventuating under state ratemaking, that might be a happy coincidence, but the right to thus effectuate the rates would flow from the contracts rather than from state law. And without some clear indication that the parties intended that state law bear on the operation or interpretation of their agreements, we could not assume that the similitude would be more than coincidental. The unmistakable thrust of the Supreme Court's decisions in Mobile and Sierra is that regulatory procedures, state or federal, do not determine the parameters of unilateral rate-increasing; rather, the parties do by mutual compact. Consequently, "state law assumes a role," if at all, "only because the parties agree that it shall"[82] whether the issue is the propriety of a higher rate or, more limitedly, whether it is temporarily collectible, even subject to refund, while the broader question is yet to be decided.
 
 
 32
 We recognize that during the period of state regulation of both wholesale and retail rates for electric energy, the parties must have believed that state law governed their relationship under contracts preceding those in suit. But that observation does not validate an argument that in the current agreements the parties subscribed to state law as the doctrinal guide to whether and how wholesale service charges might be adjusted. Only in abject contravention of the fundamentals of state-law contract-assimilation could we accept the continued reference to the state-filed tariff in the present agreements executed after the emergence of Commission jurisdiction over interstate wholesale rates as a deliberate invocation of state-law principles, absent more positive indicia such as those cropping out in Richmond Power.[83]
 
 
 33
 Here, as in Indiana & Michigan,[84] no circumstances of that sort are apparent. There we endorsed a Commission holding of nonapplicability of state law in light of contractual language similar to that now before us.[85] The Commission would distinguish that decision on the ground that the body of state law there invoked differed in content from that proffered here, but that approach demonstrates a misapprehension of the very first principle governing situations of this sort. Before any aspect of state law may even be considered, its deliberate incorporation into the parties' contract must first be established.[86] We perceived no reason in Indiana & Michigan, and we see none here, to resort to state law in the process of ascertaining the Mobile-Sierra status of the parties' rate compacts.[87]
 
 D. The Interpretation
 
 34
 With issues of state law thus dropping out of the picture, there can be no uncertainty with respect to the earliest point at which any rate elevation under the Oglesby and Ladd contracts can come to pass. Each of these agreements, we remind, calls for the tariff rates as stipulated by the parties or as later revised by an "order" promulgated under governmental auspices.[88] So, no less than in Indiana & Michigan, "(r)eference to the contract provisions . . . reveals clearly that a change in rate was to be made only when ordered by the appropriate regulatory agency"[89] which today, in regard to interstate wholesale rates, can be only the Commission.
 
 
 35
 Illinois Power contends, however, that the "order" referred to may assume the form of an agency action occurring at a stage of a Section 205 proceeding short of completion of the administrative investigation into the reasonableness of the rate-hike proposed,[90] and directs our attention to the fact that in the instant litigation the Commission allowed the sought-after increase to go temporarily into effect pending decision on propriety of the increase. We are unimpressed by Illinois Power's argument. The Supreme Court informs us that a rate change pursuant to Section 205 occurs "not by an order of the Commission but solely by virtue of the . . . company's own action."[91] And as the involved agency itself has explained, "an order by this Commission accepting for filing a rate increase filed pursuant to Section 205 is not an approval of such an increase by this Commission."[92] Consequently, action under Section 205 indulging temporary collection of a higher rate preliminarily to an administrative determination that the increase is warranted does not constitute an agency "order" affirmatively setting the new rate.
 
 
 36
 The contractual provision here at issue specifically mandates that any alteration of rates is to be effected by agency "order," not by action of one of the parties.[93] That language, most naturally construed, denotes that no change in the rate designated in the contract[94] is to take effect unless and until formally endorsed by the appropriate agency.[95] Illinois Power's unilateral filing with the Commission under Section 205 thus was legally incapable of achieving the rate increase by itself.[96]
 
 IV. THE CEDAR POINT CONTRACT
 
 37
 Like the Oglesby and Ladd agreements, the Cedar Point contract manifests no intention to import any feature of state law. In terms, however, it confers upon Illinois Power the right unilaterally to alter service rates. In relevant part it reads:
 
 
 38
 . . . Utility agrees to supply such electric energy and Customer agrees to accept and pay for service rendered hereunder, all in accordance with the rates and charges and upon the terms and conditions set forth in Utility's Service Classification No. 40, Ill.C.C. No. 5, a copy of which is attached hereto and made a part hereof and the applicable Rules, Regulations, Terms and Conditions, all of which are now on file with the Illinois Commerce Commission as part of Utility's Electric Rate Schedule.
 
 
 39
 It is understood that Utility's Electric Rate Schedule which consists of all Service Classifications, any Riders thereto, the Standard Terms and Conditions, and the Rules, Regulations and Conditions Applying to Electric Service, or any part thereof (including but not limited to portions thereof fixing charges for service to the Customer) is subject to change, from time to time, by addition, amendment or substitution, all as provided by law. In the event of such change in the Rate Schedule or any part thereof, the Utility agrees to supply and the Customer agrees to accept and pay for service thereafter and during the remainder of the term of this contract in compliance with and at the charges provided for by the Rate Schedule as changed, and such Rate Schedule as changed, to the extent applicable to service to Customer, shall thereupon be incorporated in and made a part of this contract the same as if fully set forth herein.[97]
 
 
 40
 No one suggests, nor hardly could it be contended, that Illinois law has any proper bearing on the interpretation of these provisions. To be sure, they speak of a schedule and related documents on file with the Illinois regulatory agency, but the reference is assigned no apparent function other than identification of a repository of data defining essential terms of the parties' accord. In any event, we could not accept so bland an allusion to a state body as a designed effort to engraft state law as an operative feature of the parties' agreement.[98] We look, then, to the contractual language just as it is to determine whether it reserved to Illinois Power the privilege of altering rates on its own.[99]
 
 
 41
 Doing so, we find terms making clear that Illinois Power is at liberty to launch rate changes at any time. The Cedar Point compact stipulates that the rate schedule, "including . . . (the) portions thereof fixing charges for service to the customer( ) is subject to change, from time to time, by Addition, amendment or substitution. . . ."[100] That, indisputably, contemplates party initiative. The ensuing phrase, "all as provided by law,"[101] indicates no more than that any modification must comply with applicable regulatory requirements, which in any event it must do. That phrase seems deliberately open-ended, and it invokes Section 205 as readily as any other procedure.
 
 
 42
 Indeed, Cedar Point does not strenuously disagree with this construction of the cited language when viewed alone, but argues that somehow the contract assumes quite a different character when attention is focused upon the later provision:
 
 
 43
 In the event of such change . . . the Customer agrees to accept and pay for service thereafter . . . at the charges provided for by the Rate Schedule As changed (which) shall Thereupon be incorporated and made a part of this contract . . . .[102]
 
 
 44
 Cedar Point reasons from this addition that the effective date of any change must follow a final administrative order approving it.
 
 
 45
 Support for this position is sought from the Commission's own decision in Southern California Edison Company,[103] in which a ban on unilateral rate elevations was discerned in an electric-service contract specifying:
 
 
 46
 The rates, including terms and conditions stated in the contract, are subject to change by any regulatory body now in existence as (Sic ) hereafter created by law having jurisdiction . . . . In the event of such change, the new rates and terms and conditions as prescribed shall apply to this contract . . . .[104]
 
 
 47
 Concededly, there as here the agreement envisioned effectuation of rate increases "(i)n the event of such change." But it is equally plain that there, not as here, the parties referred to rate adjustments by a "regulatory body" and no one else. Read in conjunction, these two phrases reflected a singular purpose to authorize rate modifications only after a final agency decision favorable thereto. There is no basis for that conclusion in Cedar Point's instance.
 
 
 48
 Cedar Point also relies on the Commission's decision in Indiana & Michigan,[105] where the contract stated in part:
 
 
 49
 Should any change in the rate provided for in ARTICLE 3 hereof be ordered by the Public Service Commission of Indiana, payment for services by Customer to Company . . . shall thereafter be made upon the basis of such new rate as changed and approved by the Public Service Commission of Indiana . . . .[106]
 
 
 50
 Because the Commission placed some emphasis on the word "thereafter" in holding that the parties contemplated prospective rate changes only "in the sense that payment of such rate shall be made only After the order and approval of a regulatory body"[107] Cedar Point asserts that use of "thereupon" in its contract with Illinois Power dictates the same construction. This argument completely overlooks the significance of the phrase "ordered by the Public Service Commission of Indiana," appearing in the contracts under examination in Indiana & Michigan. That critical passage plainly implicated administrative action in the rate-change process envisioned by the parties.
 
 
 51
 Cedar Point's agreement, by contrast, is utterly devoid of any reference to an administrative order. The two stipulations making the rate schedule a part of the service contract lend no assistance to Cedar Point's position. While the first[108] speaks to the scheduled rates as originally set by the parties, those rates, as we have said, were expressly made subject to change.[109] The second stipulation[110] comes into play only "(i)n the event of such change in Rate Schedule or (some) part thereof," and what it incorporates into the contract is "such Rate Schedule as changed." These provisions do no more than state the obvious: that when, in exercise of the power conferred, rates are altered, the new rates become terms of the agreement. And when considered in light of other language abundantly authorizing party initiative,[111] resort to Section 205 of the Federal Power Act is clearly permissible, and the changed rate becomes effective upon satisfaction of its demands.
 
 
 52
 Thus Cedar Point's argument is betrayed by the terms of its own agreement. As its contract was of the unconditional going-rate variety, within the pale of the Supreme Court's decision in Memphis,[112] the Commission acted properly in accepting Illinois Power's filing under Section 205, and in permitting the Cedar Point rate to become operative while its validity remains under investigation.[113]
 
 
 53
 We reverse the Commission's order insofar as it relates to Oglesby and Ladd, and with respect to these petitioners remand the case for further proceedings not inconsistent with this opinion. We affirm in all respects the order in its application to Cedar Point.
 
 
 54
 So ordered.
 
 
 
 [1]
 Pursuant to the Department of Energy Organization Act, Pub.L. No. 95-91, § 402(a), 91 Stat. 565 (1977), 42 U.S.C.A. § 7172(a) (West Supp.1977), most of the functions of the Federal Power Commission have been transferred to the Federal Energy Regulatory Commission. By the terms of §§ 705(c)-(e) of the Act, 42 U.S.C.A. §§ 7295(c)-(e) (West Supp.1977), judicial proceedings commenced prior to its effective date are unaffected save for substitution of appropriate parties. To preserve the present-tense style of this opinion as far as possible, and because the administrative proceedings in this litigation occurred before the Act became operative, we refer herein to the Federal Power Commission instead of its successor
 
 
 [2]
 We elaborate upon the administrative proceedings in Part I Infra
 
 
 [3]
 Discussed in Parts III(A), (B), (C) Infra
 
 
 [4]
 Discussed in Part III(D) Infra
 
 
 [5]
 Discussed in Part IV Infra
 
 
 [6]
 Act of June 10, 1920, ch. 285, 41 Stat. 1063, as added by Act of Aug. 26, 1935, ch. 687, pt. II, § 213(e), 49 Stat. 848, 16 U.S.C. § 824(e) (1976)
 
 
 [7]
 The relevant portions of these agreements are reproduced in text Infra at notes 36 and 97
 
 
 [8]
 The doctrine, announced in United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), and FPC v. Sierra Pac. Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), is "refreshingly simple":
 A contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid.
 Richmond Power & Light v. FPC, 156 U.S.App.D.C. 315, 318, 481 F.2d 490, 493, Cert. denied, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973); see text accompanying notes 26-35 Infra.
 
 
 [9]
 Illinois Power Co., No. E-9520 (Oct. 29, 1975), Joint Appendix (J.App.) 77. Because of a flaw in Illinois Power's June 27 submission, which was not corrected until September 30, the Commission assigned October 30 30 days after completion of the filing as the proposed effective date of the increase. Id. at 2, J.App. 78. The suspension was for three months, Id. at 3, J.App. 79, thus extending it to January 1, 1976. Id. at 3, 4, J.App. 79, 80
 
 
 [10]
 See Federal Power Act, § 205(e), 16 U.S.C. § 824d(e) (1976); note 19 Infra
 
 
 [11]
 Illinois Power Co., No. E-9520 (Mar. 8, 1976), J.App. 82
 
 
 [12]
 Quoted in text Infra at note 36
 
 
 [13]
 Illinois Power Co., supra note 11, at 3, J.App. 84. The Commission relied as we shall see, mistakenly upon our decisions in Richmond Power & Light v. FPC, supra note 8, and Appalachian Power Co. v. FPC, 174 U.S.App.D.C. 100, 529 F.2d 342, Cert. denied, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976), discussed in text Infra at notes 40-63. See Illinois Power Co., supra note 11, at 3, J.App. 84
 
 
 [14]
 Illinois Power Co., supra note 11, at 3-4, J.App. 84-85
 
 
 [15]
 Id
 
 
 [16]
 Id. at 5, J.App. 86
 
 
 [17]
 See United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), discussed in text Infra at notes 32-34
 
 
 [18]
 Illinois Power Co., supra note 11, at 2, J.App. 83
 
 
 [19]
 16 U.S.C. § 824d (1976). Section 205(c) requires public utilities to file with the Commission all rates and contracts affecting rates for sales within its jurisdiction. Id. § 824d(c) (1976). Formerly under § 205(d), changes in previously-filed rates had to be submitted to the Commission at least 30 days before they were to take effect. Id. § 824(d). Pub. L. No. 95-617, 92 Stat. 3142 (1978), modified § 824d(d) by changing the required notice period from 30 to 60 days. All references in this opinion to § 824d(d) are to the text of that section as it existed during the occurrence of the events giving rise to this litigation and, thus, prior to the amendment. See note 1 Supra. The Commission may suspend a new rate for a period up to five months pending hearing and decision on the reasonableness of the rate. Id. § 824d(e) (1976). If the investigation has not been concluded at the end of the suspension period, § 205(e) mandates that the Commission permit the rate to go into operation, but in any instance of a rate increase the Commission may order the involved utility to keep an account of the amounts received for purposes of later refund of such portion of the increase as may ultimately be found to have been unjustified. Id
 
 
 [20]
 FPC v. Sierra Pac. Power Co., supra note 8, 350 U.S. at 355, 76 S.Ct. at 372, 100 L.Ed. at 395. In the litigation at bar, the Commission declared that Illinois Power would bear in a subsequent proceeding under § 206 the § 205 "just and reasonable" burden. Illinois Power Co., supra note 11, at 4, J.App. 85; see Illinois Power Co., No. E-9520, at 4 (May 7, 1976) (order on rehearing), J.App. 104. In Sierra, the Court held that to obtain relief from fixed contract rates, a supplier must establish more than mere unprofitability of those rates:
 (W)hile it may be that the Commission may not normally Impose upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. Cf. Arkansas Natural Gas Co. v. Railroad Comm'n., 261 U.S. 379 (, 43 S.Ct. 387, 67 L.Ed. 705 (1923)). In such circumstances the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory. That the purpose of the power given the Commission by § 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities, is evidenced by the recital in § 201 of the Act that the scheme of regulation imposed "is necessary in the public interest." When § 206(a) is read in the light of this purpose, it is clear that a contract may not be said to be either "unjust" or "unreasonable" simply because it is unprofitable to the public utility.
 350 U.S. at 355, 76 S.Ct. at 372, 100 L.Ed. at 395 (emphasis in original).
 In a footnote in their brief, petitioners beseech us to rule that the Sierra burden is to be met whenever, as here, a rate change is anticipated but only by a regulatory order following an investigation. See Brief for Petitioners at 28 n.1. We decline this invitation, for the Commission subsequently supplanted its initial view that a § 206 proceeding was to be undertaken with respect to the Oglesby and Ladd contracts by its holding on rehearing, Illinois Power Co. (order on rehearing) Supra, that those agreements did, after all, permit unilateral rate increases under § 205. See text Infra at notes 21-23. Thus, in the present posture of this case, the Commission's resolve to employ a less rigorous burden-of-proof standard than that set forth in Sierra is not before us. Rather, we need now consider only whether the Commission's interpretation of the Oglesby and Ladd contracts as authorizing temporary operation of the rate increase pending the final administrative determination on its propriety was factually and legally sound.
 Moreover, even if the Commission had adhered to its ruling that a § 206 proceeding was appropriate and should utilize the more lenient standard, petitioners might not be "aggrieved" within the meaning of § 313(b) of the Federal Power Act, 16 U.S.C. § 825L (b) (1976), before the conclusion of the § 206 proceeding. The reason is that, prior to any order effectuating the sought-after rate hike, petitioners would continue to pay the existing rate for electric-power service. Faced with this issue, the Tenth Circuit recently held that because the Commission's determination was "preliminary in that (it) merely initiated a § 206 proceeding and . . . procedural insofar as (it) defined the burden of proof for that proceeding," the customer was not "aggrieved" by the Commission's refusal to impose the heavier Sierra burden in proceedings still ongoing. Public Serv. Co. v. FPC, 557 F.2d 227, 232-233 (10th Cir. 1977).
 
 
 [21]
 Illinois Power Co., supra note 20 (order on rehearing)
 
 
 [22]
 The Commission opined that Illinois law provided for a maximum suspension period of 10 months from the proposed effective date and that the Illinois Commerce Commission possessed discretion to permit effectuation earlier. Illinois Power Co., supra note 20, at 5 (order on rehearing), J.App. 105, relying on Illinois Public Utilities Act, Ill.Rev.Stat. ch. 1112/3, § 36 (1975); Streator Aqueduct Co. v. Smith, 295 F. 385 (S.D.Ill.1923); Central Ill. Pub. Serv. Co. v. Illinois Commerce Comm'n, 5 Ill.2d 195, 125 N.E.2d 269 (1955)
 
 
 [23]
 Illinois Power Co., supra note 20, at 5-6 (order on rehearing), J.App. 105-106
 
 
 [24]
 Illinois Power Co., No. E-9520 (June 25, 1976), J.App. 123
 
 
 [25]
 Jurisdiction is premised on Federal Power Act, § 313, 16 U.S.C. § 825L (1976)
 
 
 [26]
 "(D)enying . . . companies the power unilaterally to change their contracts in no way impairs the regulatory powers of the Commission, for the contracts remain fully subject to the paramount power of the Commission to modify them when necessary in the public interest." United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 8, 350 U.S. at 344, 76 S.Ct. at 381, 100 L.Ed. at 386; see also FPC v. Louisiana Power & Light Co., 406 U.S. 621, 646, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369, 388 (1972); Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), 390 U.S. 747, 820-821, 88 S.Ct. 1344, 1388, 20 L.Ed.2d 312, 366 (1968); FPC v. Sierra Pac. Power Co., supra note 8, 350 U.S. at 353-355, 76 S.Ct. at 371-372, 100 L.Ed. at 394; Appalachian Power Co. v. FPC, supra, note 13, 174 U.S.App.D.C. at 103 n.13, 529 F.2d at 345 n.13; Public Serv. Comm'n v. FPC, 177 U.S.App.D.C. 272, 305-314, 543 F.2d 757, 790-799 (1974), Cert. denied, 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); Richmond Power & Light v. FPC, supra note 8, 156 U.S.App.D.C. at 322-323, 481 F.2d at 497-498; 16 U.S.C. §§ 824(a), 824e (1976)
 
 
 [27]
 United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 8
 
 
 [28]
 Natural Gas Act, §§ 4(c), (d), (e), 5(a), as amended, 15 U.S.C. §§ 717c(c), (d), (e), 717d(a) (1976)
 
 
 [29]
 FPC v. Sierra Pac. Power Co., supra note 8, 350 U.S. at 353, 76 S.Ct. at 371, 100 L.Ed. at 394
 
 
 [30]
 Federal Power Act, §§ 205(c), (d), (e), 206(a), as amended, 16 U.S.C. §§ 824d(c), (d), (e), 824e(a) (1976)
 
 
 [31]
 FPC v. Sierra Pac. Power Co., supra note 8
 
 
 [32]
 United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., supra note 17
 
 
 [33]
 358 U.S. at 105, 79 S.Ct. at 196, 3 L.Ed.2d at 156 (emphasis in original)
 
 
 [34]
 Id. at 110, 79 S.Ct. at 198, 3 L.Ed.2d at 159
 
 
 [35]
 Appalachian Power Co. v. FPC, supra note 13, 174 U.S.App.D.C. at 105, 529 F.2d at 347
 
 
 [36]
 J.App. 29
 
 
 [37]
 Brief for Respondent at 12. In FPC v. Southern Cal. Edison Co. (Colton), 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964), the Court held that the Commission has exclusive jurisdiction over wholesale electric-power rates except those that Congress has explicitly made subject to state regulation
 
 
 [38]
 Brief for Petitioners at 7
 
 
 [39]
 16 U.S.C. § 824e (1976). Section 206 provides:
 (a) Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.
 (b) The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.
 
 
 [40]
 Richmond Power & Light v. FPC, supra note 8
 
 
 [41]
 156 U.S.App.D.C. at 319, 481 F.2d at 494
 
 
 [42]
 Id
 
 
 [43]
 So far as relevant here, the Federal Power Act applies only "to the sale of electric energy at wholesale in interstate commerce . . . ." 16 U.S.C. § 824(b) (1976); see Richmond Power & Light v. FPC, supra note 8, 156 U.S.App.D.C. at 318, 481 F.2d at 493
 
 
 [44]
 156 U.S.App.D.C. at 321, 481 F.2d at 496
 
 
 [45]
 Id. 156 U.S.App.D.C. at 321-322, 481 F.2d at 496-497
 
 
 [46]
 Id
 
 
 [47]
 Id. 156 U.S.App.D.C. at 323, 481 F.2d at 498
 
 
 [48]
 Id. 156 U.S.App.D.C. at 326, 481 F.2d at 501
 
 
 [49]
 Id. 156 U.S.App.D.C. at 324, 481 F.2d at 499
 
 
 [50]
 Id. 156 U.S.App.D.C. at 324-325, 481 F.2d at 499-500. Section 206(a) is reproduced Supra at note 39
 
 
 [51]
 Id. 156 U.S.App.D.C. at 325-326, 481 F.2d at 500-501
 
 
 [52]
 Id. 156 U.S.App.D.C. at 326, 481 F.2d at 501
 
 
 [53]
 See also Public Serv. Co. v. FPC, supra note 20, 557 F.2d at 231
 
 
 [54]
 Appalachian Power Co. v. FPC, supra note 13
 
 
 [55]
 That Virginia law in fact had this import was doubtful. But our decision did not rest to any degree on construction of state law; without regard to its content, we affirmed the Commission. 174 U.S.App.D.C. at 105 n.34, 529 F.2d at 347 n.34
 
 
 [56]
 Id. 174 U.S.App.D.C. at 105-106, 529 F.2d at 347-348, quoting Simpson Bros. v. District of Columbia, 85 U.S.App.D.C. 275, 279, 179 F.2d 430, 434 (1949), Cert. denied, 338 U.S. 911, 70 S.Ct. 350, 94 L.Ed.2d 561 (1950). See also cases cited in Appalachian Power Co. v. FPC, supra note 13, 174 U.S.App.D.C. at 106 n.36, 529 F.2d at 348 n.36
 
 
 [57]
 Appalachian Power Co. v. FPC, supra note 13, 174 U.S.App.D.C. at 106, 529 F.2d at 348
 
 
 [58]
 Id
 
 
 [59]
 Id. at 105-106, 108-109, 529 F.2d at 347-348, 350-351
 
 
 [60]
 Compare text Supra at notes 37-38
 
 
 [61]
 174 U.S.App.D.C. at 108, 529 F.2d at 350, quoting Kentucky Utils. Co., 50 F.P.C. 537, 538 (1973)
 
 
 [62]
 174 U.S.App.D.C. at 108-109, 529 F.2d at 350-351
 
 
 [63]
 Id. 174 U.S.App.D.C. at 108, 529 F.2d at 350
 
 
 [64]
 Indiana & Mich. Elec. Co. v. FPC, 174 U.S.App.D.C. 208, 530 F.2d 1060 (1976)
 
 
 [65]
 Petitions to review were filed by Richmond Power and Light, Anderson Power and Light, and Indiana Statewide. We considered only the consolidated petitions of Richmond Power and Anderson Power because of illness of Indiana Statewide's counsel. See Id. 174 U.S.App.D.C. at 209, 530 F.2d at 1061
 
 
 [66]
 Indiana & Mich. Elec. Co., 51 F.P.C. 1752, Rehearing denied, 52 F.P.C. 259 (1974)
 
 
 [67]
 174 U.S.App.D.C. at 210, 530 F.2d at 1062
 
 
 [68]
 Indiana & Mich. Elec. Co., supra note 66, 51 F.P.C. at 1753
 
 
 [69]
 Id. at 1755
 
 
 [70]
 Id. at 1754
 
 
 [71]
 See text Supra at notes 40-53
 
 
 [72]
 Brief for Petitioner at 40, Indiana & Mich. Elec. Co. v. FPC, supra note 64. Even if such a purpose were shown, the effect would be to limit the supplier's ability to change rates, not to expand it. See Richmond Power & Light v. FPC, supra note 8
 
 
 [73]
 Appalachian Power Co. v. FPC, supra note 13, 174 U.S.App.D.C. at 105 n.35, 529 F.2d at 347 n.35
 
 
 [74]
 The situation in Appalachian. To do so would violate the parol evidence rule. See note 56 Supra and accompanying text. Indeed, only when the contractual terms leave its meaning uncertain can there ever be resort to extrinsic aids
 
 
 [75]
 The situation in Indiana & Michigan
 
 
 [76]
 The situation in Richmond Power
 
 
 [77]
 See United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., supra note 17, 358 U.S. at 114, 79 S.Ct. at 201, 3 L.Ed.2d at 161; Appalachian Power Co. v. FPC, supra note 13, 174 U.S.App.D.C. at 109 n.67, 529 F.2d at 351 n.67; Gulf States Utils. Co. v. FPC, 171 U.S.App.D.C. 57, 64, 518 F.2d 450, 457 (1975); Sam Rayburn Dam Elec. Coop. v. FPC, 169 U.S.App.D.C. 281, 286, 515 F.2d 998, 1003 (1975), Cert. denied, sub nom. Gulf States Utils. Co. v. FPC, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976)
 
 
 [78]
 When the instant petitions for review were presented to this court, the Commission still had to decide whether Illinois Power was entitled to any rate increase at all
 
 
 [79]
 See Part III(B) Supra
 
 
 [80]
 Compare City of Kaukauna v. FPC, 189 U.S.App.D.C. 215, 581 F.2d 993 (1978)
 
 
 [81]
 Compare Indiana & Mich. Elec. Co. v. FPC, supra note 64
 
 
 [82]
 Appalachian Power Co. v. FPC, supra note 13, 174 U.S.App.D.C. at 105 n.35, 529 F.2d at 347 n.35
 
 
 [83]
 See text Supra at notes 40-53
 
 
 [84]
 See text Supra at notes 64-72
 
 
 [85]
 See text Supra at note 68
 
 
 [86]
 See text Supra at notes 73-76
 
 
 [87]
 Doubtlessly, numerous agreements between suppliers and purchasers of electric power, fashioned prior to assertion of Commission jurisdiction or with histories extending back into that era, allude in some wise to state agencies or procedures. In this milieu, undiscriminating interjection of state law into agreements covering interstate energy-wholesaling transactions could inflict a crazy-quilt of state regulatory phenomena upon the exercise of a highly important federal regulatory power, with potential adverse consequences for unembarrassed federal control
 We will not inquire on review into state regulatory law on flimsy grounds, nor will we encourage such excursions by the Commission. Only when assured by the contractual language in light of the surrounding circumstances that mention of state law evinces a purposeful attempt by the parties to conscript features of that law into the operation of their contracts should state-law principles be allowed entry.
 
 
 [88]
 See text Supra at note 36
 
 
 [89]
 Indiana & Mich. Elec. Co., supra note 66, 51 F.P.C. at 1754, discussed in text Supra at notes 64-72
 
 
 [90]
 Brief for Intervenor at 6-19. Illinois Power relies on the holding in Central Tel. & Utils. Corp., 50 F.P.C. 1105 (1973), that a contract providing that a rate schedule was "subject to change by order of the legally constituted rate making body having jurisdiction," Id. at 1109, authorized unilateral rate increases. Brief for Intervenor at 12-13. We need only note that the Commission itself has repudiated Central Telephone as contrary to language in the Supreme Court's opinion in Mobile addressing the Natural Gas Act's counterpart to § 205(d) of the Federal Power Act:
 Section 4(d) provides not for the filing of "proposals" but for notice to the Commission of any "change . . . made by" a natural gas company, and the change is effected, if at all, not by an order of the Commission but solely by virtue of the natural gas company's own action.
 United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 8, 350 U.S. at 342, 76 S.Ct. at 380, 100 L.Ed. at 385. See Public Serv. Co. v. FPC, supra, note 20, 557 F.2d at 232.
 
 
 [91]
 United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 8, 350 U.S. at 342, 76 S.Ct. at 380, 100 L.Ed. at 385. See also note 90 Supra
 
 
 [92]
 Indiana & Mich. Elec. Co., Supra note 66, 51 F.P.C. at 1754, quoted in text Supra at note 70
 
 
 [93]
 See text Supra at note 36. Compare Papago Tribal Util. Auth. v. FERC, (D.C.Cir.), decided today, --- U.S.App.D.C. at ---, 610 F.2d at 920-925. Decision of this case awaited Papago Tribal Util. Auth. v. FERC, supra
 
 
 [94]
 The relevant provision appears at the beginning of Part III(A) Supra
 
 
 [95]
 Although we decide that Illinois Power had no right under its agreement with Oglesby and Ladd to change rates without prior regulatory approval, we note that, even were Illinois law to apply, it probably would direct the same result. Section 36 of the Illinois Public Utility Act, Ill.Rev.Stat. ch. 1112/3, § 36 (1975), which the Commission analogizes to § 205 of the Federal Power Act, provides in part:
 Whenever there shall be filed with the (Illinois Commerce) Commission any schedule stating an individual or joint rate or other charge . . . the Commission shall have power . . . either upon complaint or upon its own initiative . . . to enter upon a hearing concerning the propriety of such rate or other charge . . . and pending the hearing and decision thereon, such rate or other charge . . . shall not go into effect. The period of suspension of such rate or other charge . . . shall not extend more than 120 days beyond the time when such rate or other charge . . . would otherwise go into effect unless the Commission, in its discretion, extends the period of suspension for a further period not exceeding 6 months.
 This section contemplates some situations in which a rate increase would become operative prior to the termination of an agency investigation. In Central Ill. Pub. Serv. Co. v. Illinois Commerce Comm'n, supra note 22, 5 Ill.2d at 206, 125 N.E.2d at 274, the Illinois Supreme Court, construing § 36, stated that "(i)f (the ten-month suspension) period has expired before the Commission has concluded its inquiry, then the utility may begin collecting charges under the new rate, So far as preexisting contractual obligations permit." (emphasis supplied). This interpretation may be viewed simply as supporting our thesis that parties voluntarily can condition effectuation of a rate increase on final agency approval, irrespective of the presence or absence of a state counterpart to § 206 of the Federal Power Act. But even if understood as a substantive feature of Illinois law, the court's construction would appear to recognize that § 36 may serve as an analogue to both § 205 and § 206 of the Federal Power Act, depending on whether the parties have authorized unilateral increases or have barred them.
 Moreover, regardless of the literal scope of § 36, in practice the Illinois Commerce Commission has, without exception, concluded its investigations of Illinois Power's past rate changes prior to expiration of the suspension period. Application for Rehearing of Illinois Power Co., J.App. 88. Certainly the practice of the state commission would bear significantly on the contracting parties' expectations concerning the treatment they would receive under Illinois law.
 We reiterate, however, that the content of state law plays no part in our decision that Illinois Power is contractually barred from forcing the new rate on Ladd and Oglesby unless and until its validity is established by final order of the Commission.
 
 
 [96]
 See United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., Supra note 8, 350 U.S. at 347, 76 S.Ct. at 382, 100 L.Ed. at 388. We intimate no view on whether the § 205 avenue would have been available had Illinois Power's filing itself specified that the rate change would not go into effect until the Commission actually approved it as just and reasonable, either by letter notice or by an order after hearing. In any event, on remand Illinois Power's filing could be treated as a prayer for relief under § 206. See FPC v. Sierra Pac. Power Co., Supra note 8, 350 U.S. at 355, 76 S.Ct. at 372, 100 L.Ed. at 395 (Court remanded for Commission consideration under § 206); Richmond Power & Light v. FPC, supra note 8, 156 U.S.App.D.C. at 322, 481 F.2d at 497 (Commission remains free upon its own motion to embark on § 206 proceeding to determine whether contract rate is unjust, unreasonable, unduly discriminatory or preferential); Public Serv. Co. v. FPC, supra note 20, 557 F.2d at 228 (finding unilateral filing under § 205 unlawful, Commission instituted proceeding to determine just and reasonable rate pursuant to § 206, with materials contained in original § 205 filing forming the basis of new proceeding); Southern Cal. Edison Co., 53 F.P.C. 921 (1975) (when contract provides for changes only upon order of regulatory authority, utility must request Commission to institute investigation under § 206 to secure rate increase). See also United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., Supra note 8, 350 U.S. at 344-345, 76 S.Ct. at 381, 100 L.Ed. at 387:
 Section 5(a) authorizes the Commission to investigate rates not only "upon complaint of any State, municipality, State commission, or gas distributing company" but also "upon its own motion." Thus, while natural gas companies are understandably not given the same explicit standing to complain of their own contracts as are those who represent the public interest or those who might be discriminated against, there is nothing to prevent them from furnishing to the Commission any relevant information and requesting it to initiate an investigation on its own motion. And if the Commission, after hearing, determines the contract rate to be so low as to conflict with the public interest, it may under § 5(a) authorize the natural gas company to file a schedule increasing the rate.
 (Footnote omitted). We do not mean to imply, however, that the heavier Sierra burden is applicable to a situation, such as this, where the contract does not purport to completely forbid rate changes, but provides only that any alteration must first be approved by the appropriate agency. See note 20 Supra.
 
 
 [97]
 J.App. 35
 
 
 [98]
 See text Supra at notes 73-83
 
 
 [99]
 See text Supra at notes 56, 59, 63, 76, 81 and note 74 Supra
 
 
 [100]
 See text Supra at note 97
 
 
 [101]
 See text Supra at note 97
 
 
 [102]
 See text Supra at note 97
 
 
 [103]
 Supra note 96
 
 
 [104]
 53 F.P.C. at 921
 
 
 [105]
 Supra note 66
 
 
 [106]
 51 F.P.C. at 1753
 
 
 [107]
 52 F.P.C. at 262 (emphasis in original)
 
 
 [108]
 See text Supra at note 97, P 1
 
 
 [109]
 See text Supra at notes 100-101
 
 
 [110]
 See text Supra at note 97, P 2
 
 
 [111]
 See text Supra at note 97
 
 
 [112]
 See text Supra at notes 32-34
 
 
 [113]
 Petitioners have raised cryptically in their reply brief an issue of undue discrimination:
 The discrimination issue is not now before this Court, and petitioners have not argued it on brief. Petitioners wish to emphasize, however, that they remain of the opinion that it would be discriminatory to deny Cedar Point treatment comparable to that accorded Oglesby and Ladd.
 Reply Brief of Petitioners at 22 n.1. We agree that the question is not presented for present resolution. Our decision simply establishes the Mobile-Sierra rights of the parties. On remand, Cedar Point is perfectly free to argue that notwithstanding its lack of those rights, it should be treated comparably to the other petitioners. We intimate no view on either the propriety of that course or on its proper outcome. We note, however, that this court has recently held that "if it is shown that a rate differential exists which stems from the fact that a public utility is free to file for unilateral rate increases with respect to some of its customers while the rates it charges to the remainder are frozen under the Mobile-Sierra doctrine, and if Nothing else is demonstrated, then that rate differential does not violate § 205(b) of the Federal Power Act (16 U.S.C. § 824d(b) (1976))." Boroughs of Chambersburg v. FERC, 188 U.S.App.D.C. 310, 315, 580 F.2d 573, 578 (1978) (emphasis in original); Cf. Metropolitan Edison Co. v. FERC, 194 U.S.App.D.C. 44, 595 F.2d 851 (1979); Town of Norwood v. FERC, 190 U.S.App.D.C. 409, 587 F.2d 1306 (1978).